**Certiorari Denied, January 7, 2009, No. 31,463**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-015**

**Filing Date:  October 24, 2008**

**Docket No. 27,959**

**ANGELA VICTORIA WOODHULL, Ph.D.,**

    **Plaintiff-Appellant,**

**v.**

**CAROLYN MEINEL,**

    **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Valerie M. Huling, District Judge**

Angela Victoria Woodhull, Ph.D.
Gainesville, FL

Pro Se Appellant

Bannerman & Williams, PA
Bryan J. Davis
Albuquerque, NM

for Appellee

**OPINION**

**BUSTAMANTE, Judge.**

**{1}**    Angela V. Woodhull, Ph.D. (Plaintiff), acting pro se, appeals the trial court's grant of summary judgment in favor of Carolyn Meinel (Defendant).  The trial court ruled that the applicable New Mexico statute of limitations and 47 U.S.C. § 230 (1998), the Communications Decency Act of 1996 (CDA), both bar Plaintiff's defamation claim. Plaintiff's appeal presents the first opportunity for this Court to consider the statute of limitations and CDA as they relate to Internet-based defamation claims in New Mexico.  We

1

reverse the trial court's grant of summary judgment and remand.

**{2}** Plaintiff also appeals the trial court's decision on three other matters, including denial of her motion for summary judgment, denial of her motion to sanction defense counsel, and denial of her motion to amend her civil complaint. Defendant argues that, while her motion for summary judgment on the statute of limitations and CDA was properly granted, her motion for summary judgment on grounds that Plaintiff is not the real party in interest was improperly denied. We do not consider any of these matters because of procedural issues.

## BACKGROUND

**{3}** Defendant operates the website http://www.happyhacker.org. Plaintiff's defamation claim is based on two instances of Defendant's posting comments on her website about or relating to Plaintiff in a section entitled "It Sucks to Be Me." On October 14, 2003, Defendant posted an email message from Plaintiff entitled "Please contact me" and stating "I have a job for you." Just below the email message Defendant posted her own comments. Specifically, she stated that upon calling, Plaintiff knowingly solicited her to commit a federal crime by offering her the job of "breaking into a news web site that had written something unflattering about her."

**{4}** Approximately two years later, on January 6, 2006, Defendant made a second posting on her website titled *"The worst of 'It Sucks to Be Me,' 2005."* The posting first recapped the 2003 incident described above, adding that even after Plaintiff was informed that she was requesting a criminal act, she nonetheless offered to pay for its performance. It went on to state that Defendant's only recourse against Plaintiff for her alleged unlawful request was "to *make fun of her* on this website."

**{5}** Defendant's 2006 posting also contained the content of an email exchange between Defendant and Mike Gimignani, a staff member at the Independent Florida Alligator (the Alligator), a student run newspaper at the University of Florida. In that exchange, Defendant asked Gimignani whether his newspaper's website (http://www.alligator.org) had information about Plaintiff that she "disliked." Gimignani's response contained details about a dispute between Plaintiff and the Alligator related to whether a play by Plaintiff featured "dancing penises and condoms." Defendant additionally commented that further research revealed that Plaintiff had "been on *America's Funniest Home Videos*" and "says she is proud to be known as *Wedgie Woman*."

**{6}** Defendant argues that summary judgment was proper because the statute of limitations has expired as to both postings by operation of New Mexico's so-called "single publication" rule. *See* NMSA 1978, § 41-7-1 (1955). Defendant further argues that the CDA immunizes her from liability because she is a "user or provider of an interactive computer service," and she merely posted information from another "information content provider."

## STANDARD OF REVIEW

2

**{7}**     Our review from a grant of summary judgment is de novo. *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M.750, 137 P.3d 1204. Where reasonable minds cannot differ as to an issue of material fact, the court may properly grant summary judgment. *Martinez v. Metzgar*, 97 N.M. 173, 174, 637 P.2d 1228, 1229 (1981).  We are mindful that summary judgment is a "drastic remedial tool which demands the exercise of caution in its application," and we review the record in the light most favorable to support a trial on the merits. *Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 231, 836 P.2d 1249, 1252 (Ct. App. 1992).

**DISCUSSION**

**Statute of Limitations and Single Publication Rule**

**{8}**     The statute of limitations for a defamation claim is three years and begins running at the point of publication. *Fikes v. Furst*, 2003-NMCA-006, ¶ 7, 133 N.M. 146, 61 P.3d 855, *rev'd in part on other grounds*, 2003-NMSC-033, ¶ 1, 134 N.M. 602, 81 P.3d 545. Information is generally considered "published" when it is made available to the public. *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1131 (9th Cir. 2006).  Plaintiff brought this cause of action in January 2007.  Thus, her defamation claim for the December 2003 posting is clearly barred by the three-year statute of limitations.

**{9}**     Defendant argues that Plaintiff's defamation claim for the 2006 posting is also time-barred based on New Mexico's single publication rule, which provides as follows:

> No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture.  Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

Section 41-7-1.  Under this rule, multiple disseminations of the same content give rise to only one cause of action, and the statute of limitations runs from the point at which the original dissemination occurred.  Defendant argues that the 2006 posting constituted a single publication relating back to her 2003 posting and that Plaintiff's cause of action for the 2006 incident is therefore also barred by the statute of limitations.

**{10}**     We take this opportunity to adopt the majority position applying the rule to Internet publications. *See Atkinson v. McLaughlin*, 462 F. Supp. 2d 1038, 1051-52 (D. N.D. 2006) (concluding that jurisdictions are "nearly unanimous" in their application of the single publication rule to the Internet).  The traditional policy reasons behind the single publication rule support its application to the Internet.

**{11}**     The single publication rule is designed "to protect the defendant[s] and the courts

from a multiplicity of suits, an almost endless tolling of the statute of limitations, and diversity in applicable substantive law." *Anselmi v. Denver Post, Inc.*, 552 F.2d 316, 321 n.2 (10th Cir. 1977). Absent this rule, publishers and the mass media would be subject to a multiplicity of claims leading to potential harassment, excessive liability, and draining of judicial resources. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984). As with traditional mass media, content on a public website is broadly available and easily reproduced. It may be viewed by literally millions in a broad geographic area for an indefinite time period. *See Reno v. ACLU*, 521 U.S. 844, 853 (1997) (recognizing that the Internet "constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers"). Thus, there is a similar if not greater need for the policy advanced by the single publication rule in the Internet realm.

**{12}** "Republication" is an exception to the single publication rule, giving rise to a new cause of action that restarts the statute of limitations. *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002). Republication occurs upon "a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition." *Id.* (internal quotation marks and citation omitted). The justification for the exception is to allow redress when the republished material is intended to expand the scope of the original distribution. *Id.* As demonstrated by the cases considering the exception, the point at which Internet republication may occur depends heavily on the facts of each case.

**{13}** Updating a website with information unrelated to the originally alleged defamatory material is not sufficient to trigger the republication exception. In *Firth*, the defendant posted a report on its website which contained allegedly defamatory statements. *Id.* at 464. Although the claim was otherwise barred by the statute of limitations, the plaintiff argued that a republication occurred when the website was updated with new reports unrelated to the plaintiff. *Id.* at 466. In rejecting this argument, the court reasoned that "[t]he justification for the republication exception has no application . . . to the addition of unrelated material . . ., for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience." *Id.*

**{14}** Similarly, mere technical modifications, as opposed to changes in the nature of the information itself, are insufficient to constitute republication. In *Churchill v. State*, a website had been modified by moving and altering a menu bar and a press release in a new section of the website, the effect of which was to make the offending material more prominent and more easily accessible. 876 A.2d 311, 315 (N.J. Super. Ct. App. Div. 2005). Citing *Firth*, the court in *Churchill* reasoned that finding republication from such minor alterations to a website would "discourage the placement of information on the Internet or slow the exchange of such information, reducing the Internet's unique advantages." *Id.* at 317 (internal quotation marks and citation omitted). "In order not to retrigger the statute of limitations, a publisher would be forced either to avoid posting on a web site or use a separate site for each new piece of information." *Id.* (internal quotation marks and citation

4

omitted). Thus, the court reasoned that it would defeat the purpose of the single publication rule to treat mere technical changes as republications when they did not alter the "substance or form" of the material. *Id.* at 319.

**{15}** Drawing from both *Firth* and *Churchill*, at least one court has found republication based on changes to the actual "substance or form" of the original material. In *In re Davis*, the defendant created a website that allegedly defamed the plaintiff and members of the Plaintiffs' family. 334 B.R. 874, 880-81(Bankr. W.D. Ky. 2005)*, rev'd in part on other grounds*, 347 B.R. 607 (W.D. Ky. 2006). After the statute of limitations expired on the original material, the defendant added new sections to the website titled "Breaking News!" and "Update!" *Id.* at 884 (internal quotation marks omitted). Both sections contained substantial substantive additions to the website relating directly to the plaintiff. *Id.* The court found that republication had occurred because the changes related to the original defamatory material had "altered both the substance and the form of the original material." *Id.*

**{16}** The question of whether Internet republication has occurred is highly factual in that it turns on the content of the second publication as it relates to the first. When a second publication goes beyond mere editing or adds content, it may properly be considered a republication if the effect is more than a "delayed circulation of the original edition." *See Firth*, 775 N.E.2d at 466 (internal quotation marks and citation omitted). Plaintiff argues that Defendant added substantively when she provided the "update" in 2006. A comparison of the content of two postings from the record also indicates that substantive additions were made in 2006, and Defendant concedes that the second posting "substantially altered the content."

**{17}** While Defendant concedes that alterations were made in 2006, she also argues that substantive changes alone are insufficient to constitute republication. Defendant relies on *Hoesten v. Best*, 821 N.Y.S.2d 40 (App. Div. 2006). There, the court refused to find republication absent a showing that the alleged defamatory statements were communicated to a new audience. *Id.* at 46. Defendant's reliance on *Hoesten* is misplaced because in that case there were no substantive changes to the content. *See id.* (characterizing the two statements at issue as "identical reports"). In *Hoesten*, the court found that republication did not occur when "identical reports" were made on two separate occasions to virtually the same audience. *Id.* In that context, the court concluded that "statements . . . made on a new occasion . . . to the same audience . . . involv[ing] the identical subject matter," were "more akin to a delayed release of previously published matter as opposed to a distinct republication." *Id.* at 46-47. Thus, the court's conclusion was not that distribution to a new audience is required, but that absent substantive changes, such distribution is a consideration that may give rise to republication. *Hoesten* contains important factual distinctions that makes it unhelpful in this case.

**{18}** We hold that the 2006 publication is sufficiently different from the 2003 version to create a genuine issue of fact as to whether the 2006 posting can reasonably be viewed as

5

a republication. A jury should make that decision. We reverse the trial court's grant of summary judgment in favor of Defendant on this issue and remand for further proceedings.

**Communications Decency Act**

**{19}** Under the CDA "[n]o *provider* or *user* of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). The CDA further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). These provisions have consistently been interpreted as conferring broad immunity to providers or users of interactive computer services for information originating from a third party. *See Ben Ezra, Weinstein, & Co. v. Am. Online Inc.,* 206 F.3d 980, 984-85 (10th Cir. 2000); *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997); *Barrett v. Rosenthal,* 146 P.3d 510, 513 (Cal. 2006).

**{20}** In order to qualify for immunity, a factual determination must be made to establish whether (1) the defendant is a "provider or user of an interactive computer service," (2) the claim asserted treats the defendant as the "publisher or speaker of information," and (3) the published information was "provided by another information content provider." *Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703, 714 (Ct. App. 2002) (internal quotation marks and citation omitted). In order for summary judgment to be proper, the trial court must find that there is no genuine issue of material fact as to whether Defendant satisfied each element.

**{21}** Although the record indicates some dispute as to whether Defendant's website constitutes an "interactive computer service," we conclude that this element is met. 47 U.S.C. § 230(f)(2) defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer service, including specifically a service or system that provides access to the Internet." Plaintiff argues that this provision is meant to cover only Internet Service Providers (ISP's) such as America Online, or Internet chat or blog sites to which anyone may freely post information or commentary. Plaintiff points out that http://www.happyhacker.org does not allow direct third-party posting, and that Defendant admitted that her website was non-interactive in response to an interrogatory. Plaintiff argues that the nature of the website and Defendant's admission places Defendant outside of the scope of the CDA, because she is not providing an interactive service.

**{22}** Plaintiff's argument fails to consider the full scope of the CDA. The CDA protects not only providers of interactive computer services, but also mere users of such services. Individual websites like Defendant's fall within the CDA by their use of the interactive computer services making them available on the Internet. *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (finding no need to determine whether a website was itself an "interactive computer service" because, in order to be made available on the Internet, a website is necessarily a *user* of an interactive computer service). Here, Defendant's website

6

is housed on a third-party's server which allows Internet access to multiple users. Therefore, Defendant's website falls within the scope of the CDA.

**{23}** Next, we examine whether Plaintiff is treating Defendant as the publisher or speaker of the defamatory material. Plaintiff's complaint alleged that Defendant made defamatory claims against Plaintiff on her website and continues to post defamatory material about Plaintiff. At trial, Plaintiff also alleged that Defendant used specific defamatory words in reference to Plaintiff. Thus, we conclude that this element is met.

**{24}** Finally, we consider whether the alleged defamatory material was provided by another "information content provider" within the meaning of the CDA. The CDA defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Thus, the question becomes whether Gimignani and the Alligator may be considered the sole provider of the content contained in the second posting or whether Defendant may be considered at least partly responsible for its creation or development. To the extent that Defendant may be considered an original "information content provider," she may also be held accountable in defamation. *See Barrett*, 146 P.3d at 527 n.19 (noting that "[a]t some point, active involvement in the creation of a defamatory Internet posting would expose a defendant to liability as an original source"); *cf. Zeran*, 129 F.3d at 330 (recognizing that an original, culpable party who posts a defamatory message would not escape accountability).

**{25}** In general, the exercise of traditional editorial functions such as selecting material for publication or editing portions of material before posting do not rise to the level of content creation or development. *Batzel*, 333 F.3d at 1031. For example, in *Ben Ezra Weinstein & Co.*, deleting data from a stock quotation before posting it to a website was considered an editorial function not resulting in liability. 206 F.3d at 985-86. Similarly, in *Batzel*, choosing to publish one email over others (content selection) and making minor alterations to the email was not sufficient to give rise to liability under the CDA. 333 F.3d at 1032.

**{26}** The holding in *Batzel* stems from the prevalent view that the CDA is intended and designed to promote Internet self-regulation. 47 U.S.C. § 230(c)(2)(A) states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material." In enacting 47 U.S.C. § 230, Congress was, in large part, responding to the New York state court decision of *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). *Zeran*, 129 F.3d at 331. In *Stratton Oakmont*, the plaintiffs sued the defendant (an interactive computer service) for defamatory comments made by an unidentified third party on the defendant's website. *Stratton Oakmont*, 1995 WL 323710, at *1. Though the defendant was not the original content provider, it was held liable as the publisher of the comments because it controlled content on its website by actively screening and editing messages posted on its bulletin boards. *Id.* at *4. The *Zeran* court summed up

the purpose of the CDA in the context of both its express language, and its relation to *Stratton Oakmont*, concluding:

> Congress enacted [47 U.S.C.] § 230 to remove the disincentives to self[-]regulation created by the *Stratton Oakmont* decision. Under that court's holding, computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted [47 U.S.C.] § 230's broad immunity to "remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). In line with this purpose, [47 U.S.C.] § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.

*Zeran*, 129 F.3d at 331. Here, a genuine issue of fact exists as to whether Defendant's actions went beyond those intended to be immunized under the CDA. Instead of merely editing an email from a third party, Defendant apparently requested potentially defamatory material for her own stated purpose of "'making fun of' Plaintiff." That material was incorporated into an overall larger posting containing her own thoughts and contributions. As in *In re Davis*, Defendant also stated that her posting was an "update" to one of her own prior postings. *See* 334 B.R. at 884. Therefore, Defendant's actions could reasonably be viewed as going beyond what is protected by the CDA, exposing Defendant to potential liability as an original "information content provider."

**{27}**   Another aspect of this case raises a related issue of fact that remains to be determined. Defendant parses out the individual elements of her 2006 post in order to focus solely on her editorial role with respect to the content provided by Mr. Gimignani. By parsing out the text of Mr. Gimignani's email from Defendant's own additions, Defendant creates a question as to whether the 2006 posting could reasonably be viewed as containing two substantive elements calling for separate analysis and treatment: one that may have been a mere posting of an email from a third party such that it is protected by the CDA, and another that may have been more of a delayed release of an existing publication such that it constitutes a "single publication." This determination could affect the outcome not only of the CDA question, but also of the republication question. Here again, we conclude that reasonable minds could differ on the propriety of considering it a single, unitary posting or as containing individual elements to be analyzed separately. Therefore, we reverse the trial court's grant of summary judgment on this issue and remand.

**Other Matters**

**{28}**   Having found the grant of summary judgment on the statute of limitations and CDA

8

improper, we do not consider Plaintiff's appeal of the denial of her motion for summary judgment on the merits or Defendant's appeal of the denial of her motion for summary judgment in which she claims Plaintiff is not the real party in interest. Generally, denial of a motion for summary judgment is not in itself appealable because parties may still obtain the relief to which they may be entitled after additional discovery or trial on the merits. *See Doe v. Leach*, 1999-NMCA-117, ¶ 12, 128 N.M. 28, 988 P.2d 1252. On remand, either party may again seek relief from the trial court on the grounds previously asserted in their respective motions. Therefore, we give no further consideration to this issue at this time.

**{29}** Nor do we consider Defendant's argument that the trial court erred in denying her motion for summary judgment on the ground that Plaintiff is not the real party in interest. Defendant failed to file a notice of appeal on this issue pursuant to Rule 12-201(A) NMRA, and therefore appeal of this matter is not properly before this court. Even if Defendant's appeal was procedurally sufficient, as previously observed, denial of the motion for summary judgment should not be considered under these circumstances. Again, the trial court made no determination as to whether Plaintiff is in fact the real party in interest, but only ruled that Plaintiff would be allowed to bring forth more evidence on the matter. The trial court acted within its discretion, and Defendant retains her opportunity to be heard on these matters at the trial level. Therefore, we give no further consideration to this issue at this time.

**{30}** Finally, we dispose of Plaintiff's appeal of the denial of her motion to sanction defense counsel and her motion to amend her civil complaint. Plaintiff's pro se brief is generally quite deficient and, with respect to these matters, fails to provide any argument other than citing two irrelevant, non-binding cases. "Although pro se pleadings are viewed with tolerance, a pro se litigant, having chosen to represent himself, is held to the same standard of conduct and compliance with court rules, procedures, and orders as are members of the bar." *Newsome v. Farer*, 103 N.M. 415, 419, 708 P.2d 327, 331 (1985) (emphasis omitted) (citation omitted). Pro se litigants must comply with the rules and orders of the court and will not be treated differently than litigants with counsel. *Bruce v. Lester*, 1999-NMCA-051, ¶ 4, 127 N.M. 301, 980 P.2d 84. Therefore, pursuant to Rule 12-213(A)(4) NMRA (requiring that the brief in chief contain an argument), we do not consider the portion of Plaintiff's appeal concerning the denial of her motion to sanction defense counsel or her motion to amend the denial of her civil complaint.

**CONCLUSION**

**{31}** For the foregoing reasons, we reverse the trial court's grant of summary judgment in favor of Defendant on the statute of limitations and the CDA and remand for further proceedings consistent with this opinion.

**{32}** **IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Judge**


_____

**CELIA FOY CASTILLO, Judge**

Topic Index for _Woodhull v. Meinel, No. 27,959_

| | |
|---|---|
| **CP** | **Civil Procedure** |
| CP-SL | Statute of Limitations |
| CP-SJ | Summary Judgment |
| | |
| **FL** | **Federal Law** |
| FL-CD | Communications Decency Act |
| | |
| **TR** | **Torts** |
| TR-DF | Defamation |