# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: September 10, 2014

Docket No. 32,542

JERALD W. FREEMAN, THE TEA LEAF,
INC., and THOMAS NYGARD, INC.,

       Plaintiffs-Appellees,

v.

PAUL W. FAIRCHILD, JR.,

       Defendant/Cross-Claimant-Appellee,

v.

RICHARD H. LOVE and R.H. LOVE
GALLERIES, INC.,

       Defendants-Appellants.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Barbara J. Vigil, District Judge

Keleher & McLeod, P.A.
Thomas C. Bird
Kurt Wihl
Christina Muscarella Gooch
Albuquerque, NM

for Plaintiffs-Appellees Jerald W. Freeman, The Tea Leaf, Inc.,
and Thomas Nygard, Inc.

Thompson, Hickey, Cunningham, Clow, April & Dolan, P.A.
David F. Cunningham
Brenden J. Murphy
Santa Fe, NM

for Defendant/Cross-Claimant-Appellee Paul W. Fairchild, Jr.

1

Coberly & Attrep, LLLP
Todd A. Coberly
Santa Fe, NM

for Appellants

## OPINION

**FRY, Judge.**

**{1}**    The Opinion filed on July 30, 2014 is withdrawn, and the following is substituted for it.  Defendants' motion for rehearing is denied.

**{2}**    Plaintiffs Jerald W. Freeman, The Tea Leaf, Inc., and Thomas Nygard, Inc., owned a painting that they agreed to sell to Paul Benisek.  Benisek, in turn, agreed to sell the painting to Defendants R.H. Love Galleries, Inc., and Richard H. Love (collectively referred to as Love).  Love then sold the painting to Defendant Paul W. Fairchild, Jr.  Fairchild paid Love in full for the painting, but Love never completely paid Benisek, and Benisek never completely paid Plaintiffs.  In this controversy over possession of the painting and amid the claims, cross-claims, and counterclaims asserted, we reverse summary judgment entered in favor of Plaintiffs against Love because they failed to make a prima facie showing of the elements necessary to support their claims.  Accordingly, we also reverse the district court's award of damages on Plaintiffs' claims against Love.  We affirm summary judgment in favor of Fairchild against Love and the district court's later award of damages on Fairchild's claims against Love.

## BACKGROUND

**{3}**    Plaintiffs jointly owned a painting by Albert Bierstadt titled "Sunset Over the Plains" (the painting).  Freeman, on behalf of himself and the other Plaintiffs, negotiated with Benisek and agreed to sell the painting to Benisek for $240,000.  In the written purchase agreement dated October 28, 2002, Benisek agreed to pay Freeman for the painting in twelve monthly installments.  He further agreed that "[t]itle in the [painting] shall remain with [Freeman] until the [p]urchase [p]rice is paid in full" and that he would execute "UCC or similar documents as [Freeman] may reasonably require."  The agreement also provided that "[Benisek] shall be in possession" of the painting.

**{4}**    On the same day that Freeman and Benisek entered into their written agreement (the Freeman/Benisek agreement), Benisek entered into a written agreement to sell the painting to Love for $300,000 (the Benisek/Love agreement).  As in the Freeman/Benisek agreement, the Benisek/Love agreement provided that Love would pay for the painting in twelve monthly installments, but the due date for each payment was scheduled to occur several days before each of Benisek's corresponding payments to Freeman.  The remaining terms of the Benisek/Love agreement were similar to the terms of the Freeman/Benisek agreement,

2

including the provision that title to the painting would remain with the seller (Benisek) until the purchase price had been paid in full and the provision that the buyer (Love) would be in possession of the painting. Thus, the two agreements were in conflict as to who had title to and who would retain possession of the painting. The other material difference between the two agreements—apart from the names of the parties, the amounts of the purchase price and the installment payments, and the due dates of payments—was the provision in the Benisek/Love agreement that "[t]he [painting] constitutes security for payment of the [p]urchase [p]rice." In addition, the Benisek/Love agreement referred to Benisek as "[s]eller's [a]gent" rather than as "[s]eller," which was the designation applied to Freeman in the Freeman/Benisek agreement.

**{5}** Despite the express terms of the Freeman/Benisek agreement, Benisek had orally agreed—prior to the execution of either agreement—to sell the painting to Love, and he had also given possession of the painting to Love. Also prior to the execution of the two agreements and contrary to the express terms of the Benisek/Love agreement, Love had orally agreed to sell the painting to Fairchild for $375,000 and had given Fairchild possession of the painting in exchange for cash and three other paintings. The cash and three paintings constituted payment in full from Fairchild to Love for the painting.

**{6}** In summary, Benisek agreed to purchase the painting from Freeman and sold and delivered the painting to Love, who in turn sold and delivered the painting to Fairchild, all before Benisek signed the written agreement with Freeman promising to retain possession of the painting and before Love signed a similar agreement with Benisek also promising to retain possession of the painting. The only person who paid for the painting in full was Fairchild.

**{7}** Love made the first four installment payments owed to Benisek, and Benisek in turn made the first four installment payments to Freeman. Then, in April 2003, Love told Benisek that he was declaring a moratorium on any further payments due to financial troubles, and Love's check for the fifth installment payment bounced. Benisek had already made his fifth installment payment to Freeman, so he informed Freeman about Love's moratorium and asked Freeman to return the fifth payment to him.

**{8}** Although the details are far from clear, Love and Freeman apparently made contact at some point after this because Love sent a letter to Freeman's attorney explaining that he was experiencing financial difficulties. In the letter, Love proposed to liquidate various assets and to allow creditors to assert liens on certain assets "in amounts and on terms to be negotiated." The letter further provided that creditors would forebear enforcing their liens or claims for a period of time until Love could reestablish his gallery. Finally, the letter stated that Love would make his financial information available to Freeman if Freeman signed and returned a non-disclosure agreement. Freeman did sign the non-disclosure agreement, which essentially provided that Freeman would "enter discussions concerning past and potential business transactions with [Love]" and that Freeman would "use best efforts to assure that any confidential and/or proprietary information disclosed in connection

3

with such discussions will be kept confidential." The record does not disclose any further details about other discussions, if any, between Love and Freeman.

**{9}** In February 2004, Fairchild apparently placed the painting on consignment with Owen Gallery, and Freeman saw an Owen Gallery catalog offering the painting for sale. Freeman asked Owen Gallery if he could view the painting, and Owen Gallery shipped the painting from New York to a gallery in Santa Fe, New Mexico, where Freeman was located. Freeman then took possession of the painting and refused to return it to Owen Gallery.

**{10}** Shortly after Freeman regained possession of the painting, he filed suit against Benisek, Love, and Fairchild. Freeman sought (1) a declaratory judgment establishing that his rights to possession of the painting were superior to the rights of Defendants, and (2) damages for breach of contract, conversion, negligent misrepresentation, fraud, prima facie tort, and breach of the implied covenant of good faith and fair dealing. Freeman later amended his complaint to add the other Plaintiffs. Fairchild then filed counterclaims against Plaintiffs for declaratory judgment, conversion, and fraud, and cross-claims against Love for fraud, negligent misrepresentation, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Act).

**{11}** After nearly six years of litigation, Plaintiffs filed a motion seeking partial summary judgment against Love on their claims for breach of contract, negligent misrepresentation, and fraud. Following a hearing, the district court granted the motion, holding that there were no material issues of fact that (1) Love had breached the contract with Benisek "as agent for Plaintiffs" by failing to maintain possession of the painting, by failing to pay Benisek, and by failing to perfect a security interest in the painting; (2) Love negligently represented that he would keep possession of the painting and perfect a security interest in it; and (3) Love was guilty of fraud because he intended that "Plaintiffs, through their agent Benisek," rely on Love's misrepresentations and because he misrepresented to Plaintiffs, "through their agent Benisek" that he would keep possession of the painting and perfect a security interest in it while being aware that he had already sold and delivered the painting to Fairchild. Thus, the district court's summary judgment in favor of Plaintiffs depended on the notion that Benisek was acting as Plaintiffs' agent in his dealings with Love. The district court ordered that damages would be determined at a subsequent trial.

**{12}** Meanwhile, Fairchild had filed his own motion seeking partial summary judgment against Love. Instead of responding to the motion, Love's counsel moved to withdraw, and the district court granted the motion and advised Love in its order that Love would have twenty days in which to retain substitute counsel. Love did not retain substitute counsel and appeared pro se by telephone at the hearing on Fairchild's motion a month and a half later. At the hearing, Fairchild's counsel argued only that Love had not responded to Fairchild's motion for summary judgment, and the district court announced that "[b]ecause there ha[d] not been a substantive response to the motion, . . . the motion shall be granted." The court concluded that it would determine damages "at a later proceeding."

4

**{13}** Plaintiffs and Fairchild settled their respective claims against one another. Plaintiffs filed a motion for summary judgment on their claims against Benisek, which the district court granted only as to the claim for breach of contract. Plaintiffs and Benisek reached a settlement whereby Benisek agreed to pay Plaintiffs $38,000 for the breach of contract, and Plaintiffs dismissed their other claims against Benisek.

**{14}** The issue of damages to be assessed against Love in favor of Plaintiffs and in favor of Fairchild was tried to the district court over two days. Again, Love appeared pro se by telephone. At the conclusion of the trial, the district court awarded Plaintiffs $731,744 in compensatory damages and $4,390,645 in punitive damages. The court awarded Fairchild $1,942,446 in compensatory damages and $9,712,232 in punitive damages. Thus, the district court found Love liable for a total of $16,777,067 in damages. The district court denied Love's motion for a new trial. This appeal followed.

**DISCUSSION**

**{15}** Love argues that the district court erred in granting summary judgment to Plaintiffs and Fairchild and in its assessment of damages. We conclude that the district court erroneously entered summary judgment in favor of Plaintiffs. We further conclude that summary judgment in favor of Fairchild was appropriate.

**{16}** We review summary judgment de novo. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *See* Rule 1-056(C) NMRA. The appellate courts "view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). The party moving for summary judgment must make a prima facie showing and come forward with "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Rivera v. Brazos Lodge Corp.*, 1991-NMSC-030, ¶ 5, 111 N.M. 670, 808 P.2d 955.

**I.  Summary Judgment in Favor of Plaintiffs**

**{17}** Love maintains that Plaintiffs failed to make a prima facie showing that Benisek was acting as their agent in his dealings with Love. Because Plaintiffs and Love had no direct interaction with each other, Love contends, the only way Plaintiffs could prove their claims of breach of contract, misrepresentation, and fraud was by establishing an agency relationship between Plaintiffs and Benisek. We agree with Love and, as a result, we need not address Love's alternative arguments challenging the summary judgment in favor of Plaintiffs.

**{18}** Before considering the substance of Plaintiffs' motion for summary judgment, it is

5

useful to place the motion in context. When Freeman filed his initial complaint against Defendants, he alleged, among other things, that "Benisek was introduced to Freeman as a buyer for the [p]ainting . . . on or about October 28, 2002," and that Freeman entered into an agreement to sell the painting to Benisek. The complaint went on to recite the details of the Freeman/Benisek agreement and that Benisek had transferred possession of the painting to Love in violation of the agreement. The complaint then alleged that "in purchasing the [p]ainting from Freeman, Benisek was acting as agent for Love" and that Freeman "believe[d] that Defendants colluded to defraud Freeman of the [p]ainting." Nowhere in the initial complaint did Freeman allege that Benisek was acting as his (Freeman's) agent.

{19} The first amended complaint added Thomas Nygard, Inc. and The Tea Leaf as Plaintiffs and made allegations similar to those in the original complaint. Specifically, the amended complaint alleged that "[a]t all times, Benisek was acting as agent and/or partner for Defendants" and that "in purchasing the [p]ainting from Freeman, Benisek was acting as agent for Love . . . and Fairchild." The amended complaint further alleged that "Defendants entered into a partnership to purchase the [p]ainting and to defraud Plaintiffs of the [p]ainting." Once again, the amended complaint never alleged that Benisek was acting as Plaintiffs' agent. Plaintiffs never amended their complaint again in order to change their theory of the case.

{20} Plaintiffs' next major undertaking in the case was their motion for partial summary judgment against Benisek in which they alleged that Benisek was liable for breach of contract, negligent misrepresentation, and fraud. As undisputed material facts, Plaintiffs alleged that they had entered into an agreement to sell the painting to Benisek, that Benisek had stopped making the payments required by the agreement, and that Benisek had violated the agreement by failing to retain possession of the painting. At no point in this motion did Plaintiffs suggest that Benisek was ever their agent for any purpose. Indeed, in an excerpt from Freeman's deposition attached to the motion, counsel, noting that Benisek identified himself as "[s]eller's [a]gent" in several documents, asked Freeman if Benisek was Freeman's agent. Thus, as of this point in the litigation—some six years after the suit was filed—the pleadings and evidence had given no indication that Plaintiffs believed Benisek was their agent. Yet, on the very same day that they filed their motion for summary judgment against Benisek, Plaintiffs filed their motion for summary judgment against Love, in which they rested their entire argument on the notion that Benisek was their agent. Against this contextual backdrop, we turn now to the substantive aspects of that motion.

{21} It is undisputed that Plaintiffs did not have any direct contact or a direct contractual relationship with Love at the relevant times when the painting was being sold and possession was being transferred. Consequently, Plaintiffs could not establish that Love breached a purported contract with them or that Love made any misrepresentations to them unless they proved that Benisek was acting as their agent when he entered into the Benisek/Love agreement and when Love allegedly misrepresented to Benisek that he (Love) would keep

6

possession of the painting.[1] And, as we have noted, Plaintiffs' argument in their motion for summary judgment was based on their contention that Benisek was their agent when he entered into the Benisek/Love agreement.

**{22}** "An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair, or does some service for the principal, with or without compensation." *Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 16, 150 N.M. 669, 265 P.3d 720 (alteration, internal quotation marks, and citation omitted). While the authority of an agent may be actual or apparent, Plaintiffs do not argue that Benisek's authority was anything other than actual. "Actual authority is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship." *Id.* (internal quotation marks and citation omitted). An agency relationship does not arise until the principal "manifests assent to [the agent] that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Maes v. Audubon Indem. Ins. Group*, 2007-NMSC-046, ¶ 17, 142 N.M. 235, 164 P.3d 934 (internal quotation marks and citation omitted). Significantly, "[t]he existence of agency is a question of fact." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 26, 131 N.M. 772, 42 P.3d 1221. Therefore, in order to establish entitlement to summary judgment, it was Plaintiffs' burden to make a prima facie showing of an agency relationship between themselves and Benisek. *See id.*

**{23}** We pause to address Plaintiffs' contention that Love never argued in response to the motion for summary judgment that Plaintiffs failed to establish the existence of an agency relationship with Benisek. This contention is unavailing because, even if Love had not responded at all to Plaintiffs' motion, we would still have to consider whether Plaintiffs made a prima facie showing of entitlement to summary judgment. *See Brown v. Taylor*, 1995-NMSC-050, ¶ 8, 120 N.M. 302, 901 P.2d 720 (explaining that "[t]he moving party may not be entitled to judgment even if the non-moving party totally fails to respond to the motion" because "until the moving party has made a prima facie case that it is entitled to summary judgment, the non-moving party is not required to make any showing with regard to factual issues" (internal quotation marks and citation omitted)). Moreover, Love clearly argued at the summary judgment hearing that Plaintiffs' claim of agency was questionable.

**{24}** Plaintiffs asserted numerous allegedly undisputed material facts to support their

---

[1]We recognize that third-party beneficiaries may be able to recover for breach of contract under some circumstances. *See Fleet Mortg. Corp. v. Schuster*, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 811 P.2d 81 (stating that a third party may have an enforceable right against an actual party to a contract if the third party is an intended beneficiary of the contract). However, Plaintiffs do not argue that they are third-party beneficiaries of the Benisek/Love agreement.

7

motion for summary judgment against Love, including the following:

- Plaintiffs owned the painting and, through Freeman, they began negotiating with Benisek about selling the painting in October 2002.

- Freeman entered into the Freeman/Benisek agreement by which Benisek purchased the painting and, on the same day, Love agreed to purchase the painting from Benisek.

- Love agreed to keep possession of the painting until Benisek was paid in full, but Love did not do this because he sold it to Fairchild. In the Benisek/Love agreement, Love agreed to execute UCC or similar documents, and the filing of a "UCC Form 1" was "[a]n important part of the [Freeman/]Benisek [a]greement."

- "Freeman relied on the provision in the [Freeman/]Benisek [a]greement that prohibited Benisek from alienating the [p]ainting before he had paid for it in full."

- Love did not pay Benisek as required by the Benisek/Love agreement and, as a result, Benisek did not fully pay Plaintiffs.

- Love issued a moratorium by which he stopped paying his financial obligations.

**{25}** The above alleged material facts do not shed any light on whether there was an agency relationship between Plaintiffs and Benisek. At most, they suggest that Love's only contractual relationship was with Benisek, and there is no material fact suggesting that Plaintiffs and Benisek had any relationship other than as sellers and buyer. No fact gives rise to any inference that Plaintiffs and Benisek explicitly or implicitly manifested to each other the assent necessary to establish the relationship of principal and agent.

**{26}** The only alleged material facts that appear to even remotely address the question of agency were as follows:

- Following Love's issuance of his moratorium, "Love's representative negotiated directly with Freeman's lawyer regarding Love's indebtedness to . . . Plaintiffs."

- Freeman signed a non-disclosure agreement stating that "the individuals who have signed as individual creditors . . . have agreed to enter discussions concerning past . . . business transactions with Love." (Alterations omitted and omissions in original).

- "The [Benisek/]Love agreement provide[d] that Benisek was Plaintiffs' agent for selling the [p]ainting to Love."

**{27}** These alleged material facts also fail to establish the existence of an agency

8

relationship between Plaintiffs and Benisek. The evidence that Love negotiated directly with Freeman and that Freeman viewed himself to be Love's creditor may be indicative of a relationship Freeman and Love may have established *after* the various sales of the painting. This evidence says nothing about whether Plaintiffs and Benisek had an agency relationship *at the time of* the sales. As for the Benisek/Love agreement's alleged provision that Benisek was acting as Plaintiffs' agent in the sale to Love, the evidence offered in support of this allegation does not support the proposition. The Benisek/Love agreement did nothing more than identify "Paul D. Benisek (Seller's Agent)" as a party to the agreement, and the body of the agreement referred to Love as "Purchaser" and Benisek as "Seller's Agent." Again, this nomenclature reveals nothing about whether Plaintiffs and Benisek manifested assent to each other to enter into an agency relationship of any kind, and such assent is essential to establishing the existence of agency. "[A]n agency relationship arises only when the elements [of mutual assent, among other things,] are present. Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage *is not controlling*." Restatement (Third) of Agency § 1.02 (2006) (emphasis added).

**{28}** Plaintiffs maintain that Love conceded the existence of an agency relationship between Plaintiffs and Benisek because Love signed the agreement referring to Benisek as "Seller's Agent" and because he entered into negotiations with Freeman directly after he stopped paying Benisek. We are not persuaded by either argument. First, as we have already noted, Benisek's label as "Seller's Agent" is meaningless without evidence that Plaintiffs and Benisek manifested assent *to one another* that an agency existed. *See* Restatement (Third) of Agency § 1.02 cmt. c ("How the parties characterized the relationship is not dispositive, nor is popular usage."). Second, whatever negotiations Love entered into with Plaintiffs *after* the sale from Benisek to Love are irrelevant to the existence of a Plaintiffs/Benisek agency relationship. Perhaps Love and Plaintiffs entered into their own direct agreement about payment for the painting, but Plaintiffs did not present any evidence about the details of any such purported agreement. To the extent Plaintiffs argue that Love "ratifi[ed] Benisek's agency for . . . Freeman," an agent's conduct can only be "ratified" by the putative principal, which in this case would be Plaintiffs. *See* Restatement (Third) of Agency § 4.03 (2006) (stating that "[a] person may ratify an act if the actor acted or purported to act as an agent *on the person's behalf*" (emphasis added)).

**{29}** We also decline Plaintiffs' invitation to conclude that Plaintiffs ratified Benisek's sale agreement with Love. Apparently conceding that they did not make this argument in the district court, Plaintiffs argue that we can affirm on this "right for any reason" basis. An appellate court may "affirm the district court if it is right for any reason and if affirmance is not unfair to the appellant." *Bd. of Cnty. Comm'rs v. Chavez*, 2008-NMCA-028, ¶ 12, 143 N.M. 543, 178 P.3d 828 (internal quotation marks and citation omitted). We conclude that affirming on this basis would be unfair to Love for two reasons. First, Love had no opportunity in the district court to respond to the unasserted argument about ratification. Second, the question of ratification is highly fact-dependent, and Plaintiffs did not present evidence sufficient for the district court to determine whether Plaintiffs had made a prima

9

facie showing of ratification. *See State v. Vargas*, 2008-NMSC-019, ¶ 8, 143 N.M. 692, 181 P.3d 684 ("Under the 'right for any reason' doctrine, we may affirm the district court's order on grounds not relied upon by the district court if those grounds do not require us to look beyond the factual allegations that were raised and considered below." (internal quotation marks and citation omitted)).

{30}    In summary, we hold that Plaintiffs failed to make a prima facie showing of an agency relationship between themselves and Benisek.  Without the existence of such a relationship, Plaintiffs could not establish that Love breached any contract with them because Plaintiffs have not shown the existence of a contract between themselves and Love. Plaintiffs further could not show that Love made any negligent or fraudulent misrepresentations to them because all of Love's relevant representations were made only to Benisek.  Therefore, summary judgment in favor of Plaintiffs against Love was improper. Because summary judgment was improper, the award of damages to Plaintiffs was also in error.

## II.    Summary Judgment in Favor of Fairchild

{31}    Fairchild sought partial summary judgment against Love on the issues of liability for fraud, negligent misrepresentation, and violation of the Illinois Act.  Love, whose counsel had withdrawn, filed no response to the motion.  At the hearing on the motion, which Love attended by phone, Fairchild's counsel did not argue the merits of the motion but instead argued only that Love was "in default" and that Fairchild was entitled to summary judgment. Love responded that he filed no response because he had no counsel.  He also contended that he was not at his office due to ill health and did not often get his mail.  He stated, "If there is some way to reconsider this, I would like to."  The district court responded, "I find that there is not a sufficient basis upon which to allow . . . Love additional time in which to respond. Because there has not been a substantive response to the motion, under the Rules . . . I find that the motion shall be granted."  And, as it did in connection with Plaintiffs' summary judgment, the district court reserved the issue of damages to be determined at a later proceeding.

{32}    We agree with Love that it was error for the district court to grant Fairchild's motion for summary judgment solely on the basis of Love's failure to respond to the motion.  *See Brown*, 1995-NMSC-050, ¶ 8 ("The moving party may not be entitled to judgment even if the non-moving party totally fails to respond to the motion."). The district court should have deemed admitted the facts alleged in Fairchild's motion and then determined whether those facts made a prima facie showing of entitlement to summary judgment.  *See id.* (explaining that "until the moving party has made a prima facie case that it is entitled to summary judgment, the non-moving party is not required to make any showing with regard to factual issues" (internal quotation marks and citation omitted)).  Because our review is de novo, we undertake this task and conclude that Fairchild did establish a prima facie case of entitlement to summary judgment, and we affirm on the ground that the district court was right for another reason.  *See Vargas*, 2008-NMSC-019, ¶ 8.

## A. Negligent Misrepresentation

**{33}** In order to prevail on his claim of negligent misrepresentation, Fairchild had to make a prima facie showing that (1) Love made a material misrepresentation of fact to Fairchild, (2) Fairchild relied upon the representation, (3) Love knew the representation was false at the time it was made or he made it recklessly, and (4) Love intended to induce Fairchild to rely on the representation. *See Saylor v. Valles*, 2003-NMCA-037, ¶ 17, 133 N.M. 432, 63 P.3d 1152. A misrepresentation can be made by either commission or omission. *In re Stein*, 2008-NMSC-013, ¶ 35, 143 N.M. 462, 177 P.3d 513.

**{34}** Fairchild alleged in his motion for summary judgment that Love did not own the painting, had not paid for it, had no bill of sale showing ownership when he sold the painting to Fairchild, and that Love knew these facts and did not disclose them to Fairchild when he sold the painting. Fairchild further alleged that he would not have bought the painting or paid the purchase price had he known that Love did not own the painting and had not paid for it and that he relied on Love's misrepresentations by omission. In addition, Fairchild alleged that Love knew Fairchild was relying on him to be honest. Fairchild presented evidence supporting these allegations. Thus, Fairchild established a prima facie case of Love's liability for negligent misrepresentation.

## B. Fraud

**{35}** The elements of fraudulent representation are virtually the same as the elements of negligent misrepresentation except that the elements must be proved with clear and convincing evidence. *See Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 22, 310 P.3d 611. Under the procedural posture of this case, the heightened burden of proof should have no impact. Fairchild supported his allegations of fact with evidence establishing each element. Therefore, we conclude that Fairchild established the prima facie liability of Love on the claim of fraudulent misrepresentation.

## C. Illinois Act

**{36}** In order to prove a private claim under the Illinois Act, a claimant must establish "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005). These elements are similar to the elements of negligent and fraudulent misrepresentation discussed above. The only additional element is that the deception must occur "in the course of conduct involving trade or commerce." *Id.* The Illinois Act defines the terms "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value . . . and shall include any trade or commerce directly or indirectly affecting the people of this [s]tate." 815 Ill. Comp. Stat. 505/1(f) (2007). Given

11

the evidence Fairchild submitted in support of his claims for negligent and fraudulent misrepresentation, plus evidence that Love's alleged deception occurred in the course of his sale of the painting to Fairchild, it is clear that Fairchild also made a prima facie showing of entitlement to judgment on the claim under the Illinois Act.

**{37}** Because Fairchild established prima facie entitlement to judgment under all of his claims against Love, we conclude that the district court's entry of summary judgment in favor of Fairchild was proper for a reason other than Love's failure to file a response to Fairchild's motion. It is not unfair to Love to employ this "right for any reason" analysis because Love had the opportunity to respond to Fairchild's prima facie showing and failed to do so. We therefore turn to the question of whether the district court's award of damages to Fairchild was proper.

## III.     Damages Awarded to Fairchild

**{38}** As previously mentioned, the district court conducted a hearing on damages and awarded Fairchild $1,942,446 in compensatory damages and $9,712,232 in punitive damages. Love argues that the damages awards were erroneous because (1) part of the compensatory damages were awarded for Fairchild's loss of the "use of the money" he had spent to purchase the painting, which is simply prejudgment interest in disguise, and Illinois law does not permit the recovery of prejudgment interest; (2) the award of attorney fees, costs, and interest was contrary to Illinois law and, even if such damages were compensable, the district court failed to exclude fees and costs attributable to work unrelated to this case; (3) nothing in the Illinois Act permitted the district court to award Fairchild compensation for his own time expended in the course of the litigation; and (4) the punitive damages award was insupportable because it was based on the grossly erroneous award of compensatory damages and because it was based in part on evidence of Love's "bad acts" that were unrelated to his conduct in connection with the sale of the painting.

**{39}** At first blush, it does seem extraordinary that Fairchild should be awarded in excess of $11 million for the fraudulent sale of a painting worth in the neighborhood of $400,000. But we need not analyze Love's arguments attacking the damages awards because, as Fairchild contends, Love failed to preserve his arguments in the district court.

**{40}** Fairchild presented the testimony of several witnesses, both live and by deposition, as well as documentary evidence on the question of damages. Love cross-examined some of the witnesses. Love introduced no evidence of his own apart from a very short direct examination of Fairchild. At no point did Love make any of the arguments challenging the damages award that he now makes on appeal.

**{41}** Love maintains that he preserved his arguments in his motion for a new trial, which he filed after the district court entered judgment in favor of Fairchild. We are not persuaded. The motion for a new trial argued that "the [j]udgment is excessive, that [it] violated [Love's] rights to due process of law, and for error in evidentiary rulings." The motion

provided no elaboration on these points. More importantly, a motion for new trial cannot make up for the failure to preserve issues at trial. *See Goodloe v. Bookout*, 1999-NMCA-061, ¶ 13, 127 N.M. 327, 980 P.2d 652 ("Raising the matter in [the] motion for a new trial came too late; objections must be raised in time for the [district] judge to correct the error to prevent prejudice."), *superseded by rule on other grounds as stated in Acosta v. Shell W. Exploration & Prod., Inc.*, 2013-NMCA-009, 293 P.3d 917.

**{42}** Love next argues that we should exercise our discretion to review the unpreserved arguments for fundamental error. *See* Rule 12-216(B) NMRA (stating that the appellate court may, in its discretion, review questions that were not preserved in the district court if they involve jurisdiction, general public interest, or fundamental error or fundamental rights of a party). Our Supreme Court has observed that it "has applied the doctrine [of fundamental error] in civil cases under the most extraordinary and limited circumstances." *Estate of Gutierrez ex rel. Jaramillo v. Meteor Monument, L.L.C.*, 2012-NMSC-004, ¶ 33, 274 P.3d 97. The Court pointed to two cases that applied the doctrine. In one case, the Court in its discretion considered unpreserved arguments related to jury instructions on the theory of successive tortfeasors because, at the time, there was very little case law on the theory, and there were no applicable uniform jury instructions. *Payne v. Hall*, 2006-NMSC-029, ¶ 37, 139 N.M. 659, 137 P.3d 599. In the other case, the Court considered an argument made for the first time on appeal because the factual basis for the argument did not even occur until after the initial appeal was filed. *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶¶ 9, 19-20, 150 N.M. 398, 259 P.3d 803. However, in *Estate of Gutierrez*, the Court declined to consider an unpreserved argument regarding jury instructions even though there were no uniform jury instructions because established case law provided the necessary guidance. 2012-NMSC-004, ¶ 34. The circumstances in the present case bear no resemblance to those in *Payne* and *Rivera*.

**{43}** Along similar lines, this Court has noted that "the common element in civil cases that have been reversed for unpreserved error has been the total absence of anything in the record of the case showing a right to relief in the person granted relief." *Gracia v. Bittner*, 1995-NMCA-064, ¶ 25, 120 N.M. 191, 900 P.2d 351. In the present case, we cannot say that the record is devoid of evidence supplying a basis for the damages awarded to Fairchild; indeed, Love does not argue that the evidence was insufficient to support the award.

**{44}** In response to Fairchild's argument that Love failed to preserve the damages issues raised on appeal, Love relies on a statement in *Gracia* in urging us to consider the arguments made for the first time on appeal. We stated in *Gracia* that "[w]hen a statute does not grant a right to relief in a particular situation, it is fundamental error to grant relief based on the statute." *Id.* ¶ 26. Thus, Love contends, it was fundamental error for the district court to award damages not allowed under the Illinois Act.

**{45}** We have difficulty with Love's contention. The portions of the transcript Love relies on to demonstrate the district court's alleged error comprise arguments of Fairchild's counsel or the testimony of Fairchild's original attorney. These portions of the transcript are

meaningless in the absence of legal argument by Love to the district court to provide context. Love made no attempt below to relate the testimony to the legal argument he makes for the first time on appeal. In addition, the exhibits Love points to in support of his argument show total attorney fees charged and itemized attorney fee statements, but these documents shed no light on which charges may or may not be permitted by the Illinois Act.

**{46}** As a result, we fail to see a valid basis for exercising our discretion to consider Love's arguments that were not brought to the district court's attention in the first place. As we noted in *Gracia*, "[w]here there exist theories of recovery that are both within the pleadings and within the evidence, we should not reverse on an issue raised for the first time on appeal after the opportunity has passed to timely correct any error presented by the issue." 1995-NMCA-064, ¶ 28. To reverse in these circumstances "would countenance sandbagging by trial attorneys" and a "waste of resources by both our trial and appellate courts." *Id.*

**{47}** We recognize that Love may have been at a disadvantage during the damages trial because he was not represented by counsel. However, "a pro se litigant, having chosen to represent himself, is held to the same standard of conduct and compliance with court rules, procedures, and orders as are members of the bar." *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 30, 145 N.M. 533, 202 P.3d 126. It was incumbent upon Love, as it is upon any attorney, to raise his arguments challenging the claimed damages at a time when the district court had the opportunity to consider them and correct any error. *Kilgore v. Fuji Heavy Indus. Ltd.*, 2009-NMCA-078, ¶ 50, 146 N.M. 698, 213 P.3d 1127 ("The primary purposes for the preservation rule are: (1) to specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the district court should rule against that claim, and (3) to create a record sufficient to allow this Court to make an informed decision regarding the contested issue."). Love did not do this, and we do not consider his arguments to rise to the level of extraordinary circumstances triggering our discretion to address them under the doctrine of fundamental error. *See Estate of Gutierrez*, 2012-NMSC-004, ¶ 33 (explaining that the doctrine should be applied in civil cases only "under the most extraordinary and limited circumstances"). We therefore affirm the district court's award of damages to Fairchild.

**CONCLUSION**

**{48}** For the foregoing reasons, we reverse summary judgment and the resulting damages award entered in favor of Plaintiffs against Love. We affirm the judgment in favor of Fairchild.

**{49}**   **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

14

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**LINDA M. VANZI, Judge**