**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: <u>May 25, 2017</u>

**NO. 34,379**

**DAVID C. YOUNG,**

  Plaintiff-Appellant,

v.

**TODD J. WILHAM and JOURNAL**
**PUBLISHING COMPANY,**

  Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Valerie Huling, District Judge**

Stephen E. Lane
Albuquerque, NM

Vega Lynn Law Offices, LLC
Rosario D. Vega Lynn
Albuquerque, NM

for Appellant

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Lauren Keefe
Gregory P. Williams
Albuquerque, NM

for Appellees

**OPINION**

**HANISEE, Judge.**

{1}     Plaintiff David Young brought defamation and false light invasion of privacy claims against Defendants Todd Wilham and Journal Publishing Company concerning a number of statements contained within articles written by Wilham, a reporter, and published in the *Albuquerque Journal* (the *Journal*), a local newspaper for which he worked. The articles questioned aspects of Plaintiff's dichotomous service to the Albuquerque Police Department (APD) as a paid civilian employee and an unpaid reserve officer. The district court dismissed some of Plaintiff's claims pertaining to the published statements under Rule 1-012(B)(6) NMRA and granted Defendants summary judgment on the others. Plaintiff appeals both dispositive orders. He also appeals the district court's legal conclusion that he is a public official who, under *New York Times Co. v. Sullivan*, 376 U.S. 254, 283-86 (1964), must prove Defendants acted with "actual malice" in publishing the challenged articles. Plaintiff also contends that rejection of his claims deprives him of heightened protections afforded only by the New Mexico Constitution. We affirm.

# BACKGROUND

## Factual Background

{2}   Plaintiff was employed as a civilian by APD. Beginning in 1999, he was assigned to APD's Special Investigations Division (SID) as a fleet manager and certified technical specialist. Plaintiff was responsible for setting up and monitoring electronic surveillance in support of SID operations, during which he frequently worked alongside detectives in the field. When this sparked safety concerns, the SID commander asked that Plaintiff be trained as a reserve officer so that he could carry a gun and a badge when assisting with field operations. In 2005 Plaintiff resumed work with SID as a civilian technician, certified also to act as a reserve officer during SID operations. At the time, SID was short two detectives, so a supervisory APD lieutenant obtained authorization for Plaintiff to assist SID in a tactical capacity during enforcement activities.

{3}   In this arrangement, Plaintiff (as a civilian employee) set up and monitored electronic surveillance for SID operations, and also (as a reserve officer) performed undercover detective work when asked to do so by SID supervisors. According to one such supervisor, it was not uncommon for Plaintiff to switch between both roles in the same SID operation. Plaintiff was entitled to be paid for the work he performed as a civilian technician, but reserve officers are volunteers who receive no pay for

2

their work. Yet there is no dispute that neither Plaintiff nor SID supervisors adequately documented the amount of time Plaintiff spent performing each of his roles. According to Plaintiff, he accounted for reserve officer time by adjusting his time sheets, deducting that time he spent performing reserve officer duties from the total time he recorded in a given shift. For example, if Plaintiff worked until one o'clock in the morning and had spent one hour performing reserve officer duties, he would record on his time sheet that he had only worked until midnight. Thus, Plaintiff explained that the civilian duties for which he was paid as an APD employee were in fact differentiated from his unpaid volunteer activities as a reserve officer. However, Plaintiff's time sheets did not show any deductions, and there were no "other contemporaneous records" reflecting the differentiation between Plaintiff's paid and unpaid overtime activities.

{4} Reporting for the *Journal*, Defendant Wilham obtained Plaintiff's time sheets and payroll information through a public records request. Wilham also obtained court and arrest records from the operations in which Plaintiff participated. Upon his comparison of the documents, Wilham concluded that Plaintiff had been impermissibly paid for performing reserve officer duties, including instances in which he made arrests—a function not allowed reserve officers. That is because the dates and times when Plaintiff recorded making arrests overlapped with time periods for

3

which Plaintiff reported and was paid overtime. To allow "time for . . . [APD] to start an independent investigation and to figure out what [Plaintiff's] status was before any story was published[,]" Wilham provided the information he had gathered to APD's police chief, Ray Schultz, one week before the first article was published. Wilham also made three requests of APD for additional documents, but it was only after publication of his first story that APD responded. Also prior to publication, Wilham contacted APD's public information officer to request an interview with Plaintiff and unsuccessfully attempted to contact Plaintiff directly. Wilham eventually spoke with Plaintiff's attorney, but Plaintiff never responded to Wilham and no interview with Plaintiff was arranged by APD. In fact, APD ordered Plaintiff and his supervisors not to speak with Wilham and told them that "Chief Schultz was going to handle it."

{5}     Between August 19, 2009, and October 20, 2009, the *Journal* published a series of articles concerning Plaintiff and the APD reserve officer program. Earlier articles focused on Plaintiff's reserve officer activities—stating that Plaintiff made arrests and collected overtime pay for doing police work—in the context of explaining that state law and city ordinance prohibited reserve officers from making arrests and being paid for reserve-related work. Later articles reported on APD's reserve officer program more generally, including APD's temporary suspension of it and changes APD made to it subsequent to an internal investigation. The *Journal*

published additional aspects of the story as its series evolved, including that many of the cases based on arrests Plaintiff made had been dismissed, the "cozy" relationship between Plaintiff and high-ranking APD officials, and the $175,000 settlement the city paid to three women who had been arrested by Plaintiff.

**Procedural Background**

{6}     In 2012 Plaintiff sued Defendants, seeking damages for defamation and false light invasion of privacy. Plaintiff claimed that the published articles defamed him by: (1) characterizing him as a "wannabe cop," (2) stating that he fraudulently collected pay for reserve officer activities, (3) stating that he lacked proper training to perform police functions, (4) stating that he had committed illegal and unethical conduct, (5) stating that he was not a police officer, (6) asserting that he had violated APD standard operating procedures and New Mexico law in actions as a reserve officer, (7) asserting that he had engaged in misconduct in his work as a reserve officer, and (8) suggesting that he was responsible for the suspension of the APD reserve officer program. Plaintiff also claimed that Defendants "placed him before the public in a false light by . . . labeling [him as] a 'wannabe cop[,]' . . . stating that he had collected overtime pay for perform[ing r]eserve [o]fficer duties[,] and[] attempting to portray him as unqualified to perform police functions."

5

**{7}** Defendants moved to dismiss the entirety of Plaintiff's complaint for failure to state a claim pursuant to Rule 1-012(B)(6). The district court granted Defendants' motion in part, allowing Plaintiff to proceed only with his claims of defamation and false light invasion of privacy "aris[ing] from Defendants' statements concerning Plaintiff's collection of overtime pay and the related statements concerning Plaintiff's collection of overtime pay while making arrests and performing police work."

**{8}** Following discovery, Defendants moved for summary judgment. Finding that Plaintiff was a public official and thus applying the actual malice standard set forth in *New York Times Co.*, the district court granted Defendants' motion because Plaintiff produced no evidence that Defendants acted with actual malice. This appeal followed.

**DISCUSSION**

**{9}** On appeal, Plaintiff argues that the district court committed reversible error when it: (1) deemed Plaintiff a "public official" required to establish "actual malice" in order to succeed on his claims of defamation and false light, (2) applied Rule 1-012(B)(6) to dismiss Plaintiff's defamation and false light claims arising from Defendants' characterization of Plaintiff as a "wannabe cop," (3) granted Defendants summary judgment on the remaining claims, and (4) failed to afford Plaintiff protections conferred by the New Mexico Constitution.

6

## I. The District Court Properly Found That Plaintiff Is a Public Official and That the *New York Times Co.* "Actual Malice" Standard Applies to Both His Defamation and False Light Claims

{10} Whether a plaintiff is a public official is a question of law that we review de novo. *See Marchiondo v. Brown*, 1982-NMSC-076, ¶ 24, 98 N.M. 394, 649 P.2d 462; *see also Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 12, 147 N.M. 157, 218 P.3d 75. "Ascertaining the status of [a] plaintiff is necessary since it dictates the standard of proof applicable in the law suit." *Coronado Credit Union v. KOAT Television, Inc.*, 1982-NMCA-176, ¶ 33, 99 N.M. 233, 656 P.2d 896. A private plaintiff need only prove that the defendant acted negligently in publishing a defamatory statement, *see Newberry v. Allied Stores, Inc.*, 1989-NMSC-024, ¶ 17, 108 N.M. 424, 773 P.2d 1231, whereas a public official must prove that the defendant acted with actual malice. *New York Times Co.*, 376 U.S. at 279-80. This heavier burden on "public official" plaintiffs reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. Notably for purposes of this appeal, plaintiffs deemed public officials "must hurdle the same constitutionally-based limitations on false light recovery as apply to defamation claims." *Andrews v. Stallings*, 1995-NMCA-015, ¶ 59, 119 N.M. 478, 892 P.2d 611; *see also* Restatement

7

(Second) of Torts § 652E (1977) (providing that a false light claim is actionable only if "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed"); *see also id.* cmt. d (explaining that in *Time, Inc. v. Hill*, 385 U.S. 374 (1967), the United States Supreme Court "held that the rule of *New York Times Co. . . .* also applies to false-light cases" and that despite some uncertainty as to the state of *Time, Inc.* as applied to private individuals after *Gertz v. Robert Welch*, *Inc.*, 418 U.S. 323 (1974), "the reckless-disregard rule would [still] apply if the plaintiff is a public official or public figure").

{11}     While Plaintiff concedes that New Mexico case law clearly establishes that police officers are public officials for purposes of defamation claims, *see Ammerman v. Hubbard Broadcasting, Inc.*, 1977-NMCA-127, ¶ 12, 91 N.M. 250, 572 P.2d 1258, he argues that the district court erred in classifying *him* as a public official because as a reserve officer, he lacked the status or authority characteristic of public officials. We are not persuaded.

{12}     In *Ammerman*, this Court recognized police officers "from the lowest to the highest rank" as public officials, citing with approval state court cases from across the country holding patrolmen to be public officials. *Id.* As one such court explained, although patrolmen are "the lowest in rank of police officials[,]" their "duties are

8

peculiarly governmental in character and highly charged with the public interest." *Coursey v. Greater Niles Twp. Pub. Corp.*, 239 N.E.2d 837, 841 (Ill. 1968) (internal quotation marks omitted). The *Coursey* court reasoned that "[t]he abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under [s]tate libel laws." *Id.* And the Tenth Circuit similarly observed:

> The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of this authority can result in significant deprivation of constitutional rights and personal freedoms . . . . The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

*Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981). Thus, it is the plaintiff officer's influence, responsibility, and control—and, critically, the potential abuse thereof—rather than his title, level of certification, or visibility that justifies his designation as a "public official" for defamation and false light purposes. *See Britton v. Koep*, 470 N.W.2d 518, 522-24 (Minn. 1991) (holding that a probation officer was a "public official" based on the fact that under state law, probation officers possessed authority similar to police officers and because "[t]he same opportunity to exploit the probation officer's official position exists . . . as for other peace officers").

9

{13} Despite his concurrent status as a civilian employee and reserve officer, Plaintiff was a commissioned, sworn law enforcement officer who wore a department-issued uniform when performing his reserve officer duties. He was issued a detective badge and assigned by APD to perform undercover detective work. He carried a gun, made arrests, identified himself as an officer or detective in criminal complaints, and appeared in court as such. It was precisely Plaintiff's conduct as a reserve officer—specifically carrying a detective badge, announcing his status as a detective, and making arrests while appearing to be paid, all of which were beyond Plaintiff's authority—that was the subject of Defendants' reporting.

{14} Plaintiff's view that even if *Ammerman* applies to him it would only be "to the times [Plaintiff] was operating as a reserve officer and not when he was operating as a civilian employed by APD" is unavailing. That is because the resolution of Plaintiff's status as a private individual or public official necessarily focuses on the subject matter of the allegedly defamatory statements, i.e., whether or not the statements concerned a matter of public interest or related to Plaintiff's "public official" conduct. *See Furgason v. Clausen*, 1989-NMCA-084, ¶ 33, 109 N.M. 331, 785 P.2d 242 (explaining that in determining a defamation plaintiff's status, the court's "examination focuses on whether the defamatory material concerns a public controversy or topic of legitimate public concern, together with the nature and extent

of [the plaintiff's] participation in the controversy"); *see also New York Times Co.*, 376 U.S. at 279-80 (announcing the rule that "prohibits a public official from recovering damages for a defamatory falsehood *relat*[*ed*] *to his official conduct* unless he proves that the statement was made with 'actual malice' " (emphasis added)). Here, Defendants' statements criticized Plaintiff's conduct as a reserve officer, not his activities as a civilian, and concerned the larger public controversy regarding management of APD's reserve officer program. Even if Defendants' interpretation of Plaintiff's time sheets was incorrect as Plaintiff alleges, it does not change the fact that the published statements related to Plaintiff's conduct as a reserve officer, i.e., that of a public official.

{15} We hold that Plaintiff acted under the color of authority of a sworn police officer, and his use of that authority is what Defendants called into question in the series of articles they published in the *Journal*. As such, the district court correctly determined Plaintiff to be a public official for purposes of his defamation and false light invasion of privacy claims.

**II.    The District Court Properly Dismissed Plaintiff's Claims Related to Defendants' Characterization of Him as a "Wannabe Cop"**

{16} Plaintiff argues that the district court erred when it dismissed his defamation and false light invasion of privacy claims premised upon Defendants' published characterization of Plaintiff as a "wannabe cop." Plaintiff alludes as well to other

11

published statements he contends the district court was wrong to declare not defamatory as a matter of law. He fails, however, to develop specific arguments to support these further contentions. Just as defendants "do not bear the burden to discern how [an] article has defamed [a plaintiff,]" we will not guess at what Plaintiff's undeveloped arguments may be. *Andrews*, 1995-NMCA-015, ¶ 14 (explaining that defamation plaintiffs "must plead precisely the statements about which they complain" (internal quotation marks and citation omitted)); *see Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (declining to entertain a cursory argument that included no explanation of the party's argument and no facts that would allow this Court to evaluate the claim). We therefore limit our review to Plaintiff's challenge to the district court's ruling that the descriptive term "wannabe cop" was not defamatory as a matter of law.

**A.    Standard of Review**

{17}    We review a district court's dismissal of a claim under Rule 1-012(B)(6) de novo. *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917. A district court's ruling that a statement is not defamatory as a matter of law is also reviewed de novo. *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Likewise, "the question of whether a statement portrays an individual in a false light . . . is a matter

12

of law to be determined by the court[,]" which we review de novo. *Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 751 (R.I. 2004).

{18}     A Rule 1-012(B)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of the complaint[.]" *Derringer v. State*, 2003-NMCA-073, ¶ 5, 133 N.M. 721, 68 P.3d 961. "In determining the sufficiency of a defamation pleading, [courts] consider whether the contested statements are reasonably susceptible of a defamatory connotation." *Davis v. Boeheim*, 22 N.E.3d 999, 1003 (N.Y. 2014) (internal quotation marks and citation omitted). "An action for defamation lies only for false statements of fact and not for statements of opinion." *Mendoza v. Gallup Indep. Co.*, 1988-NMCA-073, ¶ 4, 107 N.M. 721, 764 P.2d 492. The same is true for false light claims. *See Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983) (explaining that "the defense available in a defamation action that the allegedly defamatory statements are opinions, not assertions of fact, is also available in a false light privacy action"). If a statement is "unambiguously opinion, the trial court may properly rule as a matter of law." *Mendoza*, 1988-NMCA-073, ¶ 5.

**B.     "Wannabe Cop" Is a Statement of Opinion and Therefore Absolutely Privileged Speech**

{19}     The parties disagree whether "wannabe cop" reflects Defendants' opinion of Plaintiff—in which case the district court properly found it was not defamatory as a matter of law—or could be interpreted as a factual allegation—in which case a jury

13

would have to decide whether it was defamatory. Defendants argue that their use of the term "wannabe cop" is non-actionable opinion because in conjunction with the characterization, they disclosed supporting facts. Plaintiff argues that Defendants failed to disclose why they characterized Plaintiff as a "wannabe cop," thus making resolution of the claims fact-dependent and therefore inappropriate for dismissal under Rule 1-012(B)(6).

{20}     As this Court and many others have acknowledged, "[n]o task undertaken under the law of defamation is any more elusive than distinguishing between fact and opinion." *Moore v. Sun Publ'g Corp.*, 1994-NMCA-104, ¶ 24, 118 N.M. 375, 881 P.2d 735 (alteration, internal quotation marks, and citation omitted); *see Ollman v. Evans*, 750 F.2d 970, 978 (D.C. Cir. 1984) ("While courts are divided in their methods of distinguishing between assertions of fact and expressions of opinion, they are universally agreed that the task is a difficult one."). The challenge arises from the fact that "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990); *cf. Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1338-39 (2015) (considering whether questions posed in an article may themselves be defamatory and, while acknowledging that "a question's wording or tone or context sometimes may be read as *implying* the writer's answer to that question[,]" affirming dismissal under Fed. R. Civ. P. 12(b)(6) and

14

noting its refusal to "usher D.C. law down such a new and uncertain road"). This is particularly true where the facts underlying the so-called opinion are not fully disclosed because the danger exists that "a writer could escape liability for accusations of defamatory conduct simply by using, explicitly or implicitly, the words 'I think.' " *Milkovich*, 497 U.S. at 19 (alteration, internal quotation marks, and citation omitted). New Mexico courts presented with this question must consider three things: "(1) the entirety of the publication[,] (2) the extent that the truth or falsity may be determined without resort to speculation[,] and (3) whether reasonably prudent persons reading the publication would consider the statement as an expression of opinion or a statement of fact." *Marchiondo*, 1982-NMSC-076, ¶ 35. "If the material as a whole contains full disclosure of the facts upon which the publisher's opinion is based and which permits the reader to reach his own opinion, the court in most instances will be required to hold that it is a statement of opinion, and absolutely privileged." *Id.* ¶ 56 (alteration, internal quotation marks, and citation omitted); *see also* Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). In other words, "when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."

15

*Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995). That is because when "the bases for the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." *Id.* (omission, internal quotation marks, and citation omitted); *see Marchiondo*, 1982-NMSC-076, ¶ 57 (explaining that "the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact" (alteration, internal quotation marks, and citation omitted)); *cf. Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d. Cir. 1977) (explaining that an expression of opinion may be actionable "when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader"). This type of opinion cannot be false and therefore is not actionable, even if defamatory. *See Kutz v. Indep. Publ'g Co.*, 1981-NMCA-147, ¶ 7, 97 N.M. 243, 638 P.2d 1088.

{21}     In *Standing Committee on Discipline of United States District Court for Central District of California v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995), the Ninth Circuit provided a helpful discussion and illustration of the dichotomy between actionable and non-actionable opinion statements. Writing for the court, Judge

16

Kozinski noted that the Restatement (Second) of Torts § 566 "distinguishes between two kinds of opinion statements: those based on assumed or expressly stated facts, and those based on implied, undisclosed facts." *Yagman*, 55 F.3d at 1439; *see also Kutz*, 1981-NMCA-147, ¶ 26 (Donnelly, J., specially concurring) (describing the "two kinds of expressions of opinion" as articulated in the Restatement (Second) of Torts). Judge Kozinski offered the example "I think Jones is an alcoholic," which he described as "an expression of opinion based on implied facts . . . because the statement gives rise to the inference that there are undisclosed facts that justify the forming of the opinion[.]" *Yagman*, 55 F.3d at 1439 (internal quotation marks and citations omitted). Such a statement would be actionable because it fails to provide the reader or listener with the factual basis for the speaker's conclusion that Jones is an alcoholic, thus making the statement potentially defamatory. *Id.* By contrast, the following is a non-actionable statement: "Jones moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a drink in his hand. I think he must be an alcoholic." *Id.* (alteration, omission, internal quotation marks, and citation omitted). Here, where the speaker has provided the specific factual basis for his opinion that Jones is an alcoholic, his conclusion is considered pure opinion—i.e., non-defamatory as a matter

17

of law—because the reader or listener has the ability to draw his or her own conclusion as to whether Jones is an alcoholic.

{22} Judge Sack's leading treatise on defamation provides additional helpful illustrations:

> To say that a man is 'insane' may be defamatory; but to explain first that he, a political newcomer, is planning a campaign against the most popular politician in the county makes it clear that 'insanity' reflects no more than the speaker's view of the candidate's judgment or chances of success. The statement is hyperbolic and is not demonstrably false.

1 Robert D. Sack, *Sack on Defamation* § 4:3.2 at 4-48 (4th ed. 2016). Consider, also, the following:

> To say that an agent 'screwed' his client may imply knowledge of facts demonstrating that the agent unfairly dealt with the client; the opinion could, therefore, be defamatory. If it were based on an accurate statement of facts—for example, that the plaintiff received an unusually high commission—the statement would be hyperbole. To say a person was engaged in a 'scam' might be an actionable allegation of fact, but where the statement is accompanied by the fact that what the plaintiff was selling commercially was available elsewhere free or at significantly lower cost, it is opinion.

*Id.* at 4-50 (footnote omitted). In other words, publication of the predicate facts upon which the writer's subjective surmise is based transforms what may otherwise be an allegation of defamatory fact into nothing more than the writer's pure opinion with which the reader is free to agree or disagree. *See id.* at 4-52 ("Once the facts are

18

correctly stated, an author's views about them are neither provably true nor provably false and therefore are protected[.]").

{23} In this case, Defendants did not merely label Plaintiff a "wannabe cop" without disclosing any facts about Plaintiff but rather disclosed the facts on which their characterization was based. Each of the articles containing the term "wannabe cop" identified Plaintiff as a reserve officer, explained the differences between reserve officers and certified law enforcement officers, and made clear that Plaintiff was not a certified law enforcement officer. Each article informed readers that state law does not allow reserve officers to make arrests but that court records indicated that Plaintiff had made numerous arrests during his many years as a reserve officer. The context of the articles makes clear to a reasonable reader that Defendants used the term "cop" to refer to a certified law enforcement officer, i.e., an officer with arrest powers; thus the term "wannabe cop" would reasonably be understood as shorthand for Defendants' criticism of Plaintiff for acting like a certified law enforcement official (i.e., being a "wannabe cop") when he was not one. *Cf. Kutz*, 1981-NMCA-147, ¶¶ 18, 20 (finding error in the district court's dismissal of the plaintiff's complaint when "there are implications . . . that the writer has private, underlying knowledge to substantiate his comments about [the] plaintiff[,]" but "none of the privately-held information appears in the article that would permit a reader to draw his own

19

independent characterization or opinion of [the] plaintiff"). The fact that Plaintiff switched from civilian to police roles so fluidly without clear separation of them at any given time bolstered this impression. Given this context, an ordinary person reading Defendants' articles would not understand "wannabe cop" to be a statement of existing fact but rather Defendants' subjective characterization—i.e., opinion—of Plaintiff based on their interpretation of the facts. *See Marchiondo*, 1982-NMSC-076, ¶ 57.

{24} Importantly, not only does Plaintiff not dispute any of these underlying facts or claim that they are false, *see Yagman*, 55 F.3d at 1439 (explaining that "[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false"), he has alternatively relied on them (in vain, as we have already concluded) to support his argument that he is not a public official. Specifically, in his brief-in-chief, Plaintiff prevaricates that "[a]lthough [Plaintiff] is a sworn, commissioned law enforcement officer, he did not acquire certification which is typically only obtained by full-time, salaried officers." Plaintiff also attempted to avoid being designated a public official by pointing to the fact that "[a]s a reserve officer, he was supervised at all times by certified, sworn law enforcement personnel" and arguing that while New Mexico has held that police officers are public officials, that designation "has not yet attached to reserve police officers."

20

Plaintiff cannot claim *not* to be a police officer in order to avoid the public official designation and at the same time claim he "*is* a cop" in order to argue the defamatory or false nature of the label "wannabe cop." In other words, when Plaintiff himself argues that there is a distinction between a certified officer and a reserve officer, he cannot fault Defendants for pointing out that very distinction in their reporting through the use of hyperbolic headlinese.

{25}    Considering the context of the publications as a whole and Defendants' disclosure of the undisputed facts on which its conclusion was based, we conclude that Defendants' labeling of Plaintiff as a "wannabe cop" was pure opinion and thus absolutely protected by the First Amendment. The district court did not err in finding as a matter of law that Plaintiff failed to state a claim for defamation or false light invasion of privacy based on Defendants' published use of the term "wannabe cop."

**III.    The District Court Properly Granted Defendants Summary Judgment on Plaintiff's Remaining Claims**

{26}    Following discovery, Defendants sought summary judgment on Plaintiff's claims that related to Defendants' statements that Plaintiff received overtime pay for police-related work. Defendants argued that Plaintiff lacked evidence of falsity, actual malice, and reputational injury. The district court granted Defendants' motion based on its conclusion that Plaintiff failed to meet his burden of proving that any genuine

issue of material fact existed as to the question of actual malice and therefore did not address the other possible bases supporting summary judgment.[1]

{27} On appeal, Plaintiff appears to proffer two bases to support reversal of summary judgment: (1) that the district court "mistakenly granted summary judgment on the supposition that 'confusing' records excused [Defendants'] actions" because whether the records were confusing "is an issue of fact for the jury[,]" and/or (2) that the district court "erred by concluding that there was insufficient evidence from which a jury could conclude that the Defendants acted with actual malice or with reckless disregard for the truth." We note that Plaintiff dedicates less than one page to explaining his first basis, developing no facts and citing no authority to support his assertion. As to his second basis, Plaintiff does nothing more than make conclusory statements, cite our UJI that defines "wrongful acts," and cite Lt. Smith's testimony regarding his opinions of Defendants' characterization of Plaintiff as a "wannabe cop." Importantly, Plaintiff fails to develop any argument whatsoever regarding

---

[1]While Defendants argue both lack of actual malice and the substantial truth of their published statements on appeal, we need not discuss the truth/falsity element of Plaintiff's claims because we agree with the district court's basis for granting summary judgment. *See Goradia v. Hahn Co.*, 1991-NMSC-040, ¶ 18, 111 N.M. 779, 810 P.2d 798 ("A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (alteration, internal quotation marks, and citation omitted)). In other words, the issue of whether Defendants' statements were true, substantially true, or false is mooted by Plaintiff's failure to establish that Defendants acted with actual malice.

Defendants' published statements that he collected overtime pay for police-related work.[2] We limit our analysis to Plaintiff's arguments as presented. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)). To do otherwise "creates a strain on

---

[2]The dissent faults this opinion for making a "sweeping generalization that Plaintiff was inappropriately paid for overtime work as a reservist, ignoring the emphasis on Plaintiff's collection of over $12,000 specified by Defendants in the initial three articles." Dissent ¶ 47. We needn't dissect Wilham's spreadsheet (which was the source of the $12,000 figure), question its reliability or Defendants' choice not to include it with their motion for summary judgment, or speculatively attribute inordinate significance to the fact that the specific dollar amount was only included in Defendants' first three articles as the dissent does. *See* Dissent ¶¶ 47, 52, 70, 73, 77. It was Plaintiff's burden—not this Court's—to develop such arguments to survive summary judgment, and he failed to do so.

Moreover, we note that Plaintiff's first amended complaint—filed in response to Defendants' Rule 1-012(B)(6) motion to dismiss based on Plaintiff's failure to allege specific false statements that formed the basis of his claim as required by *Andrews*, 1995-NMCA-015, ¶ 14 (explaining that defamation plaintiffs "must plead precisely the statements about which they complain" (internal quotation marks and citation omitted))—merely alleged that Defendants made false statements "that [Plaintiff] fraudulently collected pay for Reserve Officer activities" and said nothing about the $12,000 statements in particular, contrary to the dissent's suggestion that Plaintiff alleged separate claims "arising from the specific $12,000 statements." Dissent ¶ 46. As this Court stated in *Andrews*, "[d]efendants do not bear the burden to discern how [an article] has defamed [the p]laintiff[]." *Id.* Thus the "immateriality" of the $12,000 figure, Dissent ¶ 74, Defendants' decision not to specifically proffer evidence of their state of mind regarding the figure, Dissent ¶ 76, and this opinion's "singular treatment of Defendants' series of eleven articles[,]" Dissent ¶ 47, result from Plaintiff's choice not to allege a defamation claim based on the specific amount reported.

23

judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments." *Id.*

**A.    Standard of Review**

{28}    "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "[W]e view the facts in a light most favorable to the party opposing the motion and draw all reasonable inferences in support of a trial on the merits[.]" *Handmaker v. Henney*, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879. "The standard of review on appeal from summary judgment is de novo." *Farmers Ins. Co. of Ariz. v. Sedillo*, 2000-NMCA-094, ¶ 5, 129 N.M. 674, 11 P.3d 1236.

**B.    Summary Judgment Appellate Review in a Defamation or False Light Case Involving a Public Official**

{29}    In New Mexico, summary judgment is generally considered a "drastic remedial tool which demands the exercise of caution in its application[.]" *Woodhull v. Meinel*, 2009-NMCA-015, ¶ 7, 145 N.M. 533, 202 P.3d 126 (internal quotation marks and citation omitted). However, "summary judgment may be proper when the moving party has met its initial burden of establishing a prima facie case for summary judgment." *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242

24

P.3d 280. In a defamation or false light case, a defendant establishes a prima facie case by "produc[ing] evidence by deposition or affidavit that [it] did not have knowledge of the falsity of the statements made . . . or that [it] did not [publish] the false statements with reckless disregard of the truth." *Ammerman*, 1977-NMCA-127, ¶ 40. "If this duty is performed, the burden shifts to [the plaintiff] to establish that a genuine issue of material fact exists." *Id.* Additionally it is well recognized that summary judgment procedures are "essential" in cases involving the First Amendment. *See Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). That is because at stake "is free debate." *Id.* As this Court recognized in *Andrews*, "[t]he failure to dismiss an unwarranted libel suit might necessitate long and expensive trial proceedings that would have an undue chilling effect on public discourse." 1995-NMCA-015, ¶ 6. As a result, the rule in New Mexico is that district courts must determine at the earliest possible stage whether a public-official plaintiff can establish that the statements regarding him are false and, if so, that there exists evidence that they were made with actual malice. *See id*. Thus, defamation and false light defendants typically seek summary judgment by either (1) "removing the issue of actual malice from the case," or (2) presenting evidence of the "truth of its statement[s]" as an absolute defense. *Ammerman*, 1977-NMCA-127, ¶¶ 15, 22 (internal quotation marks and citation omitted); *see also Rinsley*, 700 F.2d at 1307

25

("[E]ssential to both a false light privacy claim and a defamation claim is a determination that 'the matter published concerning the plaintiff is not true.' Thus, in a false light privacy action, as in a defamation action, truth is an absolute defense." (quoting Restatement (Second) of Torts § 652E cmt. a)). If a defendant successfully negates any essential element of the plaintiff's claim, it is entitled to summary judgment. *See Mayfield Smithson Enters. v. Com-Quip, Inc.*, 1995-NMSC-034, ¶ 22, 120 N.M. 9, 896 P.2d 1156 ("Summary judgment is appropriate when a defendant negates an essential element of the plaintiff's case by demonstrating the absence of an issue of fact regarding that element.").

{30}     "A reviewing court, in deciding whether summary judgment is proper, must look to the whole record and take note of any evidence therein which puts a material fact in issue." *Koenig v. Perez*, 1986-NMSC-066, ¶ 10, 104 N.M. 664, 726 P.2d 341 (internal quotation marks and citation omitted). "[W]e step into the shoes of the district court, reviewing the motion, the supporting papers, and the non-movant's response as if we were ruling on the motion in the first instance."[3] *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M. 750, 137

---

[3]We note that the dissent fails to follow this procedure, focusing exclusively on what it sees as an infirmity in Defendants' summary judgment motion and never addressing that the record as a whole—and particularly Plaintiff's response—fails to provide any evidence indicating the existence of a genuine issue of material fact as to actual malice.

P.3d 1204. In the specific context of reviewing an order granting summary judgment in a public official defamation or false light case, "an appellate court must independently examine the record to determine whether the plaintiff has proffered sufficient evidence to prove actual malice." *CACI Premier Tech. Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008); *see Andrews*, 1995-NMCA-015, ¶ 59 (explaining that such plaintiffs "must hurdle the same constitutionally-based limitations on false light recovery as apply to defamation claims"). Independent review is particularly important in such cases because "the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated." *New York Times Co.*, 376 U.S. at 285. "In cases where that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment . . . protect." *Id.* (internal quotation marks and citation omitted); *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984) (explaining that the *New York Times Co.* requirement of independent appellate review "reflects a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution"). The operative question before us is "whether the evidence in the record could support a reasonable jury finding either that

the plaintiff has shown actual malice . . . or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).

{31}    Now decades ago, *New York Times Co.* defined "actual malice" to mean "with knowledge that [a statement] was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. "The actual-malice standard does not require objectivity, a balanced presentation, or even a fair one. Rather, the standard focuses on the defendant's state-of-mind—whether [he] knew something to be false when [he] reported it, or whether [he] acted with reckless disregard to its falsity." *Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1217 (D.N.M. 2009). Thus, a plaintiff's burden is to present evidence "showing that a false publication was made with a high degree of awareness of probable falsity" or "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (internal quotation marks and citation omitted). This Court has described the plaintiff's burden at summary judgment as "difficult and in many cases impossible to meet, inasmuch as affirmative evidence of a knowing state of mind cannot be produced." *Ammerman*, 1977-NMCA-127, ¶ 18.

{32}    There is no hard and fast rule delineating what a plaintiff must show with respect to the defendant's state of mind, specifically his or her reckless disregard for

28

the truth, in order to survive a motion for summary judgment. *See St. Amant*, 390 U.S. at 730 ("Reckless disregard, it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication[.]"). Courts recognize that plaintiffs typically rely on circumstantial evidence and inference to prove actual malice. *See Herbert v. Lando*, 441 U.S. 153, 170 (1979); *Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009) ("Because direct evidence of actual malice is rare, it may be proved through inference and circumstantial evidence[.]" (citation omitted)); *Keogh*, 365 F.2d at 967-68 (explaining that recklessness "is ordinarily inferred from objective facts"). In *St. Amant*, the United States Supreme Court identified possible ways for a plaintiff to meet his burden, such as by proffering evidence that: (1) the defendant fabricated the story, (2) the story is the product of the defendant's imagination, (3) the false statement was "based wholly on an unverified anonymous telephone call," (4) the "allegations are so inherently improbable that only a reckless man would have put them in circulation," or (5) "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732. In a recent, high-profile case, a federal district court surveyed "what other courts have determined is and is not sufficient evidence" for a defamation plaintiff to survive summary judgment on the issue of actual malice and provided the following, illustrative list:

29

> [I]t is well settled that failure to investigate will not alone support a finding of actual malice. Similarly, departure from journalistic standards is not a determinant of actual malice, but such action might serve as supportive evidence. Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted. Furthermore, while actual malice cannot be inferred from ill will or intent to injure alone, it cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry. Finally, evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 871 (W.D. Va. 2016) (alteration, internal quotation marks, and citations omitted) (denying, in part, the defendant's motion for summary judgment because the court concluded that the plaintiff presented sufficient evidence—specifically, extensive deposition testimony and the reporter's notes, which indicated the reporter's doubts as to her source's credibility—that, taken as whole, could establish actual malice). *See also* 1 Sack, *supra*, § 5:5.2[A] at 5-85 (listing cases describing the myriad ways to establish evidence of actual malice); [B] at 5-95 (identifying evidence that is insufficient to show actual malice). Thus, although the actual malice standard is high, evidence that a publisher invented, prejudged, or knowingly mischaracterized facts may allow a plaintiff to survive summary judgment. However, courts generally agree that a single piece of circumstantial evidence is insufficient to establish actual malice and that

30

cumulation of evidence is necessary to reach the requisite constitutional threshold. *See Tavoulareas v. Piro*, 763 F.2d 1472, 1477-78 (D.C. Cir. 1985) (en banc) (rejecting the publisher's argument that "evidence of actual malice does not gain probative force through 'cumulation' "); *see also Eramo*, 209 F. Supp. 3d at 872 (explaining that "[a]lthough failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact"). And it is beyond debate that "[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial[,]" making summary judgment appropriate. *Goradia*, 1991-NMSC-040, ¶ 18 (internal quotation marks and citation omitted).

**C.  Defendants Made a Prima Facie Showing That They Were Entitled to Summary Judgment, and Plaintiff Failed to Rebut That Showing in Order to Survive Summary Judgment**

{33}  In this case, Plaintiff has failed to identify a single objective fact sufficient to establish evidence of actual malice, let alone the cumulative evidence necessary to create a genuine issue of material fact. In both responding to Defendants' motion for summary judgment and now on appeal, Plaintiff has not pointed to any affirmative evidence showing that Defendants published statements that Plaintiff collected

31

overtime pay for police-related work with a high degree of awareness of their probable falsity or having entertained serious doubts as to their truth. This is particularly noteworthy given that the record supplies more than merely circumstantial evidence to support Defendants' defense that they acted without actual malice. But Plaintiff simply argues that the district court erred in granting summary judgment "based on its finding that the records were confusing." Plaintiff interprets the district court's reference to "confusing" records—meaning Plaintiff's time sheets and arrest records—as being evidence of the existence of a genuine issue of material fact, which would preclude summary judgment. But the opposite is true here. In the context of establishing the existence of a genuine issue of material fact regarding actual malice, the very fact that the records were confusing points towards, not away from, granting summary judgment.

{34}    We observe, in fact, that the district court's basis for granting Defendants summary judgment was not that the records were "confusing" but rather that Plaintiff failed to rebut the "appearance that [Plaintiff] collected overtime while a reserve officer" and thus could not prove actual malice.[4] That "appearance" was made evident by numerous pieces of evidence proffered by Defendants in support of their motion

---

[4]The record reveals that the district court described the records as "confusing" at a hearing on Defendants' motion for a bill for costs held *after* the district court had already granted Defendants summary judgment, not at the summary judgment hearing.

32

for summary judgment. First, Defendants' comparative analysis of Plaintiff's time sheets and court records showed that Plaintiff had claimed overtime during the same periods when he had made arrests. For example, on Saturday, May 10, 2008, Plaintiff claimed seven-and-one-half hours of overtime on his time sheet, using the overtime authorization code "IN" for "investigation." On that day, he arrested two people for possession of a controlled substance. Plaintiff provided the following synopsis in his incident report: "While working a vice tact plan[, I noticed] a male and a female rolling and smoking a marijuana joint. . . . The female . . . admitted to me that [they were both] 'smoking' and she was on her way to work. They both were arrested without incident[.]" Plaintiff listed himself on the incident report as the "reporting officer" and identified his rank as "detective," both of which indicate reserve-related—as opposed to civilian-related—work. There are numerous other similar examples where Plaintiff claimed overtime for "investigation" work, made arrests during those periods as evidenced by uniform incident reports, described himself in those reports as "working under[]cover with the Vice Unit[,]" named himself as the "reporting officer," and identified his rank as "detective"—all at times that records reflect he was being compensated as an employee of APD. Importantly, Plaintiff does not contend that the time sheets, court records, or the spreadsheet Wilham created based on those documents were falsified or contained any errors at all. In fact, he

33

concedes that Wilham's spreadsheet "in which he document[ed Plaintiff's] overtime pay . . . represents the sum of all of [Plaintiff's] overtime hours and overtime pay." *Cf. Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520-25 (1991) (holding that evidence that the defendant fabricated or materially falsified statements may suffice to meet the plaintiff's burden to show actual malice in order to survive summary judgment).

{35} Next, Lt. Rob Smith—Plaintiff's direct supervisor who reviewed and approved Plaintiff's time sheets—admitted that (1) there was a "system failure" that resulted in records indicating that Plaintiff "was earning overtime when he was working as a reserve officer[,]" and (2) a person looking at Plaintiff's time sheets and comparing them to arrest records "would reasonably believe that [Plaintiff] was getting paid overtime [as] a reserve [officer]." Lt. Smith stated that not only would it be reasonable for someone to reach that conclusion, but he would expect it. In addition, APD's own investigation concluded that Plaintiff "was allowed to collect overtime pay for working as an undercover detective and reserve officer."

{36} Finally, Defendants pointed to two key admissions Plaintiff made to further buttress the presumption that they acted without actual malice. First, Plaintiff admitted that he knew of no one who informed Defendants that he was not paid overtime for police-related work. Well after publication, Plaintiff attempted to

account for the apparent overlap between his overtime pay and performance of reserve-officer duties by explaining that "[i]t was the unit practice when accounting for [Plaintiff's] overtime to deduct any time spent in a reserve capacity from the end of his shift, and therefore from his total hours earned." According to Plaintiff, his entire chain of command knew about these subtractive adjustments and approved the practice. The critical person who did not know about this practice, however, was Wilham.[5] Absent responsive communication from Plaintiff or APD, how could he have?

{37} Second, Plaintiff admitted that not only did his time sheets not show any of the purported deductions, they in fact showed that Plaintiff claimed overtime while doing police-related work. And while he argued that the time sheets "do not accurately reflect everything that was done" during his claimed overtime periods, he also admitted that he was not aware of "any other contemporaneous records" that would have made clear to someone reviewing his records that he was only claiming overtime for non-reserve work. These admissions confirm what seems obvious: Wilham could

---

[5]In any event, we note that even if Plaintiff or someone else had offered the "deduction" explanation to Wilham, Defendants would not necessarily have been precluded from publishing the complained-of statements. That is because even when a reporter has a document that propounds an alternative theory or figure—particularly when it is not "airtight" and may be self-serving—he is "entitled to make legitimate criticisms and present facts based on other, contradictory evidence without losing the *New York Times* [*Co.*] privilege." *Anaya*, 626 F. Supp. 2d at 1218.

35

not have known about the "unit practice" of making deductions or that Plaintiff was only claiming overtime for non-reserve work based on his review and comparison of Plaintiff's time sheets and court records because the documents themselves gave no such indication. All of this evidence was more than enough for Defendants to meet their burden of making a prima facie showing that there was no genuine issue of fact as to actual malice and supported the district court's conclusion that there was—at the very least—an appearance that Plaintiff collected overtime pay for police-related work. *See Goodman*, 1972-NMSC-043, ¶¶ 9, 11 (explaining that "[t]he burden on the movant does not require him to show or demonstrate beyond all possibility that no genuine issue of fact exists" and that such a burden "would be contrary to the express provisions of Rule [1-056]" which "serve[s] a worthwhile purpose in disposing of groundless claims, or claims which cannot be proved").

{38} In the face of this evidence, it was incumbent upon Plaintiff to identify or produce other evidence that eliminated that appearance and definitively established that the records could only be interpreted one way—as showing that his overtime pay was for non-reserve work—in order to survive summary judgment. *Ammerman*, 1977-NMCA-127, ¶ 40 (explaining that once a defendant produces evidence that it acted without actual malice, "the burden shifts to [the plaintiff] to establish that a genuine issue of material fact exists"); *see Time, Inc. v. Pape*, 401 U.S. 279, 290-91 (1971)

(holding that a publisher's "adoption of one of a number of possible rational interpretations of a document" is not actionable). He failed to do so. In opposing summary judgment, Plaintiff singularly argued that Defendants failed to interview people with "personal knowledge of [Plaintiff's] job description, activities, and payroll" and that Defendants could not "duck behind the argument that 'nobody corrected us before we published it'." But a defendant's failure to investigate does not "constitute[] sufficient proof of reckless disregard." *Ammerman*, 1977-NMCA-127, ¶ 22 (internal quotation marks omitted); *see St. Amant*, 390 U.S. at 730 (explaining that failing to verify potentially defamatory information with persons "who might have known the facts" is not sufficient to establish evidence of actual malice). Moreover, the defense of ignorance is, in fact, a valid defense to a defamation claim. *See St. Amant*, 390 U.S. at 731 (acknowledging that "[i]t may be said that [the actual malice] test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant[']s testimony that he published the statement in good faith and unaware of its probable falsity[,]" but nonetheless affirming the *New York Times Co.* standard). And in any event, Plaintiff's argument regarding Defendants' failure to further investigate and interview additional sources rings particularly hollow given that Wilham not only gathered documents through two public information requests, but in fact attempted to interview the person

37

with the greatest personal knowledge of Plaintiff's job description, activities, and payroll: Plaintiff himself. But Plaintiff refused to speak with Wilham, despite having learned from an APD deputy chief prior to the first article being published that there was "an article coming out on a wannabe cop . . . that didn't have the facts or the story straight." While it is true that "reckless disregard for the truth can be shown where there is evidence of an intent to avoid the truth, such as where failure to conduct a complete investigation involved a deliberate effort to avoid the truth," that is simply not what happened in this case. *Anaya*, 626 F. Supp.2d at 1218 (internal quotation marks and citations omitted). It was not Defendants who made deliberate efforts to avoid the truth but rather Plaintiff—and to an extent APD officials—who deliberately avoided Defendants, thus stymieing Defendants' efforts to seek and report the truth. *See Don King Prod., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 46 (Fla. Dist. Ct. App. 2010) (affirming issuance of summary judgment where the defendant "tried to interview [the plaintiff] to no avail[,]" leaving "no obvious reasons for ESPN to doubt the challenged statements").

{39}    In the end, Plaintiff failed to proffer a scintilla of evidence that Defendants in fact entertained serious doubts as to the truth of the statements that Plaintiff collected overtime pay for police-related work. *See St. Amant*, 390 U.S. at 731 ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained

serious doubts as to the truth of his publication."). Accordingly, we can only hold that Plaintiff failed to meet his burden of establishing the existence of a genuine issue of fact on the question of actual malice, and must affirm the district court's grant of summary judgment.

**IV.  Plaintiff's Constitutional Argument Is Without Merit**

{40}  Plaintiff contends that this Court's application of the actual malice standard in *Andrews* violates Article II, Section 17 of the New Mexico Constitution. We understand Plaintiff to argue that Article II, Section 17 confers greater rights than those afforded by the First Amendment to the United States Constitution, in this instance not a right *to* speech, but to restriction *of* it. Plaintiff misconstrues the New Mexico Constitution's capacity to supplant the United States Constitution and overlooks that the core citizen's right established by both constitutional provisions is *to* freedom of speech. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); N.M. Const. art. II, § 17 ("Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.").

39

{41} By arguing that Article II, Section 17's assignment of responsibility to those that abuse the right to speak curtails the breadth of the First Amendment and cases that interpret it, Plaintiff suggests that constitutionally protected words spoken elsewhere ought to be nonetheless subject to speech-restrictive litigation in New Mexico. As authority for this unlikely proposition, Plaintiff misreads *Blount v. TD Publishing Corp.*, 1966-NMSC-262, 77 N.M. 384, 423 P.2d 421, to require jury resolution of questions of fact that involve matters of public concern and rights of privacy. Indeed, the proposition Plaintiff advances requires that we reject what he calls the "federal interpretation" that differentiates public and private citizens and assigns a higher plaintiff's burden to the former. Of course, while restrictions on speech and its abuses exist in law and jurisprudence, the birth of an individual right to restrict speech would exist in a state of inexorable tension with the First Amendment. *See generally* Eugene Volokh, *Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People From Speaking About You*, 52 Stan. L. Rev. 1049, 1107-09 (2000) (considering "the unwritten constitutional 'value' of privacy" and cautioning that "changing First Amendment doctrine to let free speech rights be trumped by other 'constitutional values' derived by analogy from constitutional rights would permit a broad range of speech restrictions").

{42} But we needn't grapple today with conflicting rights nor determine a victor between one which is classically constitutional (speech) versus one that is offered as such (restriction of speech). That is because *Blount* does not stand for the far broader proposition Plaintiff advances; rather, it considered the "constitutional [rights] to freedom of the press[,]" the "right of the public to be informed[,]" and a non-public plaintiff's "right of privacy of the individual" and determined that summary judgment was improper as to the question of whether the publication was privileged because the contents were of public interest or a matter of public record. 1966-NMSC-262, ¶¶ 5, 8, 10. *Blount* had nothing to do with the distinction between a public and private plaintiff, did not discuss or apply *New York Times Co.*, and cannot be read to elevate privacy over speech as a matter of constitutional priority. Indeed, *Blount* observed that "the right of privacy is generally inferior and subordinate to the dissemination of news." 1966-NMSC-262, ¶ 10.

{43} Ultimately, it is well established that while state courts generally may find greater degrees of protection under their state constitutions where state and federal constitutional provisions overlap, we may not "restrict the protection afforded by the federal Constitution, as interpreted by the United States Supreme Court[.]" *City of Farmington v. Fawcett*, 1992-NMCA-075, ¶ 27, 114 N.M. 537, 843 P.2d 839. This Court in *Andrews* explained that *New York Times Co.* "constitutionalized the common

law tort of defamation [and] set a single standard for libel suits by public officials against the press in every court in the nation." *Andrews*, 1995-NMCA-015, ¶ 4 (internal quotation marks and citation omitted). In asking this Court to "reject the federal interpretation for defamation[,]" Plaintiff would have us ignore our own precedent, *New York Times Co.*, 376 U.S. at 727 ("We hold today that the Constitution delimits a [s]tate's power to award damages for libel in actions brought by public officials against critics of their official conduct."), and the United States Constitution. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). We decline Plaintiff's invitation to violate the United States Constitution by misusing our own.

**CONCLUSION**

{44}     For the foregoing reasons, we affirm the district court's orders.

{45}     **IT IS SO ORDERED.**

_____

**J. MILES HANISEE, Judge**

42

**I CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

**M. MONICA ZAMORA, Judge (concurring in part, and dissenting in part).**

**ZAMORA, Judge (concurring in part, and dissenting in part).**

{46} I agree with the majority that Plaintiff is a public official, that the actual malice standard applies in both his defamation and false light claims, and that the district court properly dismissed Plaintiff's claims related to the Defendants' characterization of Plaintiff as a "wannabe cop." While I also agree that we affirm summary judgment on Plaintiff's defamation and false light claims that arise from the general overtime statements, I respectfully disagree that summary judgment is appropriate on Plaintiff's defamation and false light claims arising from the specific $12,000 statements, and therefore dissent.

{47} My concern lies with the fact that the majority rests their analysis on the sweeping generalization that Plaintiff was inappropriately paid for overtime work as a reservist, ignoring the emphasis on Plaintiff's collection of over $12,000 specified by Defendants in the initial three articles. The majority's singular treatment of Defendants' series of eleven articles facilitates Defendants' ability to elude any liability where there is a high degree of awareness of probable falsehood and their reckless disregard of the truth is absolved by tucking any potentially defamatory and false light statements within a series of articles that are otherwise appropriate.

{48} In addition to the facts and procedures set forth by the majority, I submit the following supplementary factual and procedural background information.

44

## BACKGROUND

**Factual Background**

{49}    After Plaintiff completed the reserve officer training, he resumed his work with SID as a civilian technician and was permitted to carry a gun and reserve officer badge when on duty. At the time, SID was short two detectives and an APD lieutenant supervising SID operations received authorization to have Plaintiff assist in tactical operations.

{50}    Plaintiff continued to set up and monitor the electronic surveillance for SID operations, but SID supervisors also began using Plaintiff as an undercover detective. According to one supervisor, Plaintiff served dual roles in SID operations. He set up and monitored surveillance in his capacity as a civilian employee, and acted as an undercover detective in his capacity as a reserve officer. It was not uncommon for Plaintiff to serve both roles in one operation, switching between surveillance and tactical duties. However, neither Plaintiff nor the SID supervisors adequately documented the amount of time Plaintiff spent performing each of his roles. As previously noted, in his capacity as a reserve officer, Plaintiff was a volunteer and could not be paid. According to Plaintiff, he accounted for reserve officer time by adjusting his time sheets, subtracting the time he spent performing reserve duties from the total time he recorded.

{51}     After reviewing the documents he obtained, Defendant Wilham concluded that Plaintiff was being paid for his civilian duties at the same time he was performing reserve officer duties, such as making arrests. After Wilham provided the information he had gathered to APD's police chief, an internal APD investigation was initiated and the APD reserve officer program was temporarily suspended. Between August 19, 2009, and October 20, 2009, the *Journal* published a number of articles concerning Plaintiff and the APD reserve officer program.

{52}     In the first three articles, Defendants reported that Plaintiff collected more than $12,000 in overtime pay for duties he performed as a reserve officer; duties for which he should not have been paid at all. In the remaining articles, Defendants simply reported that Plaintiff collected overtime pay as a reserve officer, omitting references to the $12,000 amount.

**Procedural Background**

{53}     In their motion for summary judgment, Defendants asserted that even though Plaintiff had identified several articles that contained allegedly false statements about his overtime, "the substance of each statement is the same: [w]hile acting as a cop, [Plaintiff] has also made more than $12,000 in overtime working warrant sweeps, stakeouts, undercover prostitution stings, and making arrests."

46

{54} Defendants argued that: (1) the statements were materially true, (2) if the statements were false there was no evidence of malice, and (3) the statements did not harm Plaintiff's reputation. Defendants also argued Plaintiff was unable to demonstrate the actual malice required to establish defamation and invasion of privacy of a public official or a public figure. The district court agreed that there was no evidence of malice and granted summary judgment in favor of Defendants. This appeal followed.

**DISCUSSION**

**Defamation**

{55} Defamation actions are rooted in the common law torts of libel and slander. *See Smith v. Durden*, 2012-NMSC-010, ¶¶ 8, 9, 276 P.3d 943. At a fundamental level, defamation actions serve to compensate individuals for injury to reputation. *See id.* ¶ 10. Under New Mexico law, a prima-facie case for the tort of defamation includes: (1) a published communication by the defendant; (2) the communication includes an asserted statement of fact; (3) the communication was concerning the plaintiff; (4) the statement of fact is false; (5) the communication was defamatory; (6) the persons receiving the communication understood it to be defamatory; (7) the defendant knew the communication was false or negligently failed to recognize that it was false, or acted with malice; (8) the communication caused actual injury to the plaintiff's

47

reputation; and (9) the defendant abused its privilege to publish the communication. UJI 13-1002(B) NMRA. The Use Note points out that because Plaintiff is a public official, UJI 13-1002(B)(4) places the burden of proof of falsity upon the plaintiff. *See* UJI 13-1006 NMRA ("To support a claim for defamation, the communication must be false."); *see also Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (holding that the burden is on the public official plaintiff to prove the alleged defamatory statement is false).

{56} "For years, federal and state courts, including those in New Mexico, have been confronted with the problem of achieving a proper balance between the laws of defamation and the laws of constitutionally protected freedom of speech and of the press." *Marchiondo*, 1982-NMSC-076, ¶ 40. And "actions for defamation have evolved in many ways due [in part] to the tort's maturing constitutional infrastructure." *Durden*, 2012-NMSC-010, ¶ 10.

**False Light**

{57} New Mexico recognizes the tort of invasion of privacy, which is broken down into four categories: "false light, intrusion, publication of private facts, and appropriation." *Andrews*, 1995-NMCA-015, ¶ 58. "False light invasion of privacy is a close cousin of defamation." *Id.* ¶ 59 (internal quotation marks and citation omitted); *see Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 719 (10th Cir. 2000)

48

(distinguishing defamation from false light invasion of privacy by noting that in a defamation action recovery is sought primarily for injury to one's reputation while in a false light action it is the injury to the person's own feelings). A false light plaintiff is required to prove three things: (1) that the plaintiff was portrayed in a false light, i.e., "the matter published concerning the plaintiff is not true[,]" Restatement (Second) of Torts § 652E cmt. a; (2) that the false portrayal would be highly offensive to a reasonable person such that the plaintiff would be "justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity[,]" Restatement (Second) of Torts § 652E cmt. c; and (3) that the publisher "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E(b).

**Summary Judgment Evidence**

**1. Defendants' Evidence**

{58} In their motion for summary judgment Defendants sought to negate three elements of Plaintiff's defamation claim: the falsity of their statements, malice, and actual injury to Plaintiff's reputation. To this end, Defendants provided the district court with a sworn affidavit by Plaintiff; excerpts from the deposition testimony of Plaintiff, Wilham, and three of Plaintiff's APD supervisors; portions of the parties'

discovery responses; internal APD policies, reports, and memoranda; Plaintiff's time sheets; and records of arrests made by Plaintiff that include time sheets, corresponding arrest records, and court documents.

{59} In his responses to interrogatories, Wilham states that he received information from a confidential source that Plaintiff was being paid by APD to work as a reserve officer or to perform police work. Wilham submitted a request to the City of Albuquerque for public records and reviewed some of Plaintiff's time sheets as well as court and arrest records. During his deposition, Wilham testified that he created a spreadsheet from which he concluded that Plaintiff received overtime pay in the amount of $12,666.94 as a reserve officer.

{60} The time sheets, arrest records and court documents Defendants presented show that Plaintiff made arrests during periods of time for which he was claiming civilian overtime. For example, Plaintiff's time sheet for May 31, 2007, shows that between 7:30 a.m. and 4:00 p.m. Plaintiff worked eight hours in his civilian capacity. Plaintiff also logged six hours of overtime that day. Assuming the overtime began at the end of Plaintiff's normal shift, Plaintiff would have worked overtime in his civilian capacity between 4:00 p.m. and 10:00 p.m. An offender booking sheet from the Bernalillo County Detention Center reflects that Plaintiff made an arrest on May 31, 2007, at 7:15 p.m. Defendants presented similar documentation for approximately

twenty dates between May 2007 and July 2009. Plaintiff and one SID supervisor both admit in their deposition testimony that these documents create the appearance that at the time Plaintiff made some arrests, he was also claiming civilian overtime.

{61}    Similarly, there is overlap between the civilian overtime claimed on Plaintiff's time sheets and the reserve officer hours logged on his reserve officer activity report. For example, Plaintiff's time sheet for September 10, 2008, shows that between 7:30 a.m. and 4:00 p.m. Plaintiff worked eight hours in his civilian capacity. Plaintiff also logged eight hours of overtime that day. Again, assuming the overtime began at the end of Plaintiff's normal shift, Plaintiff would have worked overtime in his civilian capacity between 4:00 p.m. and 12:00 a.m. on September 11, 2008. A report detailing Plaintiff's reserve officer activity shows that Plaintiff worked as a reserve officer for eight hours September 10, 2008. Unless Plaintiff worked twenty-four straight hours on that day, logic would dictate that some of his reserve time would have overlapped with his civilian time.

{62}    Wilham testified that he requested an interview with Plaintiff to discuss the subject matter of his articles, but that he did not hear back. According to Wilham's discovery responses, the purpose of the request was simply to obtain an interview, not to request an interview in order to verify specific facts for his articles. In his

deposition, Plaintiff testified that he did not contact Wilham because he was instructed not to speak with the press.

{63} Wilham also stated that one week before the first article was published, he met with the chief of police and informed the chief of what he thought he had. APD internal documents indicate that APD began investigating the situation concerning Plaintiff and his overtime. In a memorandum to the chief of police detailing the investigation, the investigating lieutenant reported that Plaintiff was permitted to collect overtime as a reserve officer and as an undercover detective. The investigator determined that Plaintiff worked 106 hours of overtime as an undercover detective for which he received $2,696.64 in overtime pay. In a separate report, one APD deputy chief reported that Plaintiff's supervisor authorized payment to Plaintiff for reserve officer work "allow[ing] the roles of a paid civilian to blur with that of a reserve officer."

{64} Concerning the effect that the articles had on his reputation, Defendants presented an excerpt from Plaintiff's deposition in which Plaintiff, when asked, was unable to name anyone who thought less of him as a result of the articles.

**2.    Plaintiff's Evidence**

{65} In response to Defendants' motion for summary judgment, Plaintiff was required to "demonstrate the existence of specific evidentiary facts which would

52

require trial on the merits." *Durden*, 2012-NMSC-010, ¶ 5 (internal quotation marks and citation omitted). Plaintiff was also required to show that any alleged defamatory statements were false. *Garrison*, 379 U.S. at 74; UJI 13-1002(B)(4); UJI 13-1006. Plaintiff's evidence consisted of a sworn affidavit by Plaintiff; excerpts from the deposition testimony of Plaintiff, Wilham, and two of Plaintiff's APD supervisors; and a spreadsheet created by Wilham containing his calculations of the overtime pay received by Plaintiff.

{66} In his deposition testimony, Plaintiff explains that even though his time sheets appear to show overlap between reserve time and civilian time, he actually adjusted his time entries so that he did not get paid for reserve time. As we previously noted, to do this Plaintiff subtracted any time during his shift that was spent performing reserve officer duties from the total hours reported by adjusting the time he logged at the end of his shift. According to Plaintiff, it took him approximately thirty minutes to make an arrest, which he accounted for by documenting the end of his shift as thirty minutes prior to the time he actually ended his shift on that day. Two of Plaintiff's supervisors, in their deposition testimony, confirm that Plaintiff's hours were adjusted in this manner to account for reserve time. The supervisors also state that the practice of adjusting hours was an accepted practice within SID and APD.

{67} Wilham's spreadsheet, from which he calculated $12,666.94 in overtime pay Plaintiff received for reserve officer duties, includes information for approximately sixty-seven dates between January 2008 and July 2009. For each date the spreadsheet reflects the amount of overtime logged, the corresponding amount of overtime pay based on Plaintiff's hourly wage, a description of Plaintiff's assignments for the overtime periods, and information regarding any arrests that were made during the overtime periods. In an affidavit, Plaintiff states that the spreadsheet reflects the total amount of overtime he worked in his civilian capacity from January 2008 to July 2009 and does not include any overtime for performing reserve officer duties. Plaintiff also disputes the accuracy and authenticity of the reserve officer activity report, claiming that he did not create or approve of the document.

{68} With regard to the harm to his reputation, in his affidavit Plaintiff states that because of Defendants' articles, he was suspended from the reserve officer program and has been denied reinstatement because he is now perceived as "the guy who wrecked the reserve officer program."

**3.    Summary Judgment Merits**

{69} By moving for summary judgment, Defendants bore the burden of showing that Plaintiff failed to produce proof of actual malice. *See Ammerman*, 1977-NMCA-127, ¶ 14. Defendants have not met this burden.

54

{70} "'Actual malice'... means that [Defendants made] statements with knowledge of their falsity or with reckless disregard of whether they were true or false. 'Reckless disregard' means evidence that [Defendants] had a high degree of awareness of probable falsity, ... but nevertheless [published] the statements." *Id.* ¶ 16. As to the truth or falsity of the statements, Defendants' summary judgment evidence tends to show that Plaintiff received some overtime pay in connection with his reserve officer work. However, the affidavits and deposition testimony presented by Plaintiff create a factual question as to the amount of overtime pay he actually collected and whether it was for reserve officer work or civilian work. The obvious difficulty in this case is the impossibility of objectively verifying Plaintiff's time. This is something Defendants should have recognized, and may have apparently done so by leaving the $12,000 amount out of the subsequent articles, and by not relying on Wilham's spreadsheet in support of their motion for summary judgment. This is also an issue worthy of a jury's consideration. Similarly, with respect to Defendants' evidence on the injury to the reputation element of defamation, and the unreasonable and highly objectionable publicity element of false light invasion of privacy, I would conclude that Defendants have not demonstrated that the material facts are undisputed. *See Durden*, 2012-NMSC-010, ¶ 5.

{71} The primary question at this juncture is whether the district court erred in granting summary judgment based on its finding that Defendants acted without actual malice in publishing the $12,000 statements. Under the heightened malice standard "the defendants' state of mind was of central importance." *Marchiondo*, 1982-NMSC-076, ¶ 18 (internal quotation marks and citation omitted). In other words, what Defendants knew or suspected concerning the truth of the statements when they were published is key. *See Ammerman*, 1977-NMCA-127, ¶ 16 (recognizing that actual malice involves the making of statements despite having knowledge of their falsity, a high degree of awareness of probable falsity, or serious doubts as to the truth of the statements (internal quotation marks omitted)).

{72} In the present case, the record indicates that Wilham reviewed Plaintiff's time sheets and payroll information, as well as court documents and arrest records, and that those documents appear to show that Plaintiff was accruing overtime at the same time that he was performing reserve officer duties. And although Wilham requested interviews, neither Plaintiff nor his supervisors were immediately available to comment on the issue. Defendants argue that this evidence supports their assertion that they acted without malice, believing that the overtime statements were true or substantially true. The majority suggests that Defendants' unsuccessful attempts to interview Plaintiff or those familiar with Plaintiff's job description, activities, and

56

payroll are sufficient to allow the publication of the $12,000 amount, and if the information was incorrect, Plaintiff's failure to cooperate automatically entitles Defendants to the defense of ignorance. Majority Op. ¶ 38. Because the evidence shows that Wilham was not attempting to verify or confirm specific information or facts, the majority has essentially shrouded Defendants with immunity from liability for defamation. However, "absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation." *Gertz*, 418 U.S. at 341. There has to be some sort of balance between any constitutionally protected speech, responsible reporting, and the laws of defamation.

{73} Defendants' evidence indicates that at the time the statements were published, Defendants believed that Plaintiff had received overtime pay for reserve officer work. However, Defendants' spreadsheet is the only evidence of what they "believed" Plaintiff received for reserve officer work and that was *in excess of $12,000*. There is nothing in the record to establish what information Wilham used of all the documents he gathered, how he interpreted the information, and how he used it for each of his entries in the spreadsheet. It is Wilham's spreadsheet that creates the questions as to how that figure was derived, thereby creating a question of fact as to whether Defendants acted with a high degree of awareness of probable falsity. *Ammerman*, 1977-NMCA-127, ¶ 16.

{74} Nonetheless, Defendants argue that the evidence supports their contention that they acted without malice, believing the statements to be substantially true. I understand Defendants to argue that their state of mind with regard to the $12,000 figure is immaterial.

{75} In order to show the absence of malice, Defendants do not have to show that they believed the statements to be absolutely true in every minute detail. *See Masson*, 501 U.S. at 517. It is sufficient to show that the defendants believed their statements not to contain material falsehoods or to be substantially true. *See id.* at 516-17. In considering the material falsity or the substantial truth of a statement, we consider whether "the substance, the gist, the sting of the libelous charge be justified." *Id.* at 517 (internal quotation marks and citation omitted). Material falsity and substantial truth are two sides of the same coin. The plaintiff, in order to show malice, must show that the defendant knew or suspected the statement to be materially false. *Id.* Where the defendant has the burden of showing the absence of malice on a motion for summary judgment, for example, the defendant must show that in publishing the statement he believed it to be substantially true. *See id.* A statement may be considered substantially true if it produces the same effect on the mind of the recipient, which the pleaded truth would have produced. *See id.* ( "[A] statement is not considered false unless it would have a different effect on the mind of the reader

58

from that which the pleaded truth would have produced." (internal quotation marks and citation omitted)).

{76} Thus, in order to show that summary judgment was appropriate Defendants were required to present evidence as to their state of mind with regard to the $12,000 figure. *See Marchiondo*, 1982-NMSC-076, ¶ 22 (recognizing that under the malice standard of the *New York Times* and its progeny, proof regarding the conduct and state of mind of the defendant is essential). In determining whether Defendants' state of mind concerning the $12,000 figure is material, compare the substance of Defendants' statements with and without the figure. The statements that "[w]hile acting as a cop, [Plaintiff] has also made more than $12,000 in overtime working warrant sweeps, stakeouts, undercover prostitution stings, and making arrests[,]" would have a different effect on the mind of the reader than a statement that "[w]hile acting as a cop, [Plaintiff] has made overtime working warrant sweeps, stakeouts, undercover prostitution stings and making arrests." The former statement carries a stronger implication that Plaintiff intentionally lied on his time sheets in order to receive a sensational amount of overtime pay, over $12,000 to which he was not entitled. Whereas the latter statement leaves room in the mind of the reader as to the amount of overtime pay Plaintiff inappropriately received, which turned out to be $2,696.64.

{77} Defendants deny the existence of malice, yet, they fail to attribute the basis for their $12,000 statements. More importantly, Defendants dropped the specific dollar amount out of subsequent articles published within the two month time frame, and never relied on it in defense of the case. Whether summary judgment is precluded under such circumstances "turn[s] on the particular facts which exist therein." *Coronado Credit Union*, 1982-NMCA-176, ¶ 26. The particular facts in this case are that the extraordinary amount of overtime pay reported by Defendants in this case is material.

{78} Here, material issues of fact exist as to the truthfulness of the statements concerning the actual amount Plaintiff collected in overtime pay. The truth or more appropriately the inaccuracy of these statements must be determined at trial. "In the absence of a showing of privilege, the existence of malice is a fact question, and is not a question of law to be decided on summary judgment." *Id.* Defendants have not shown in their motion for summary judgment that they in fact had any documents or news source that established that Plaintiff had in fact made more than $12,000 for performing reserve officer duties, nor did Defendants publish the statements as privileged statements of opinion. The $12,000 figure appeared in the first two articles and one editorial. However, even in the editorial, the $12,000 is asserted as a fact, and not as part of the opinions expressed in the piece. Nowhere in the record do

Defendants argue that the $12,000 was expressed as an opinion. Their argument lies in the materiality of the fact.

{79} Viewing the evidence, as we must, in the light most favorable to Plaintiff, and drawing all reasonable inferences in support of a trial on the merits I would conclude that summary judgment on the issue of malice was premature, at least with regard to the statements referencing the $12,000 in overtime pay. *See Marchiondo*, 1982-NMSC-076, ¶ 22 (holding that the trial court erred in ruling at the summary judgment stage that the defendants acted without actual malice absent evidence concerning the defendants' state of mind, i.e., the thoughts and editorial processes on which the statements were based).

**CONCLUSION**

{80} On Plaintiff's defamation and false light claims arising from the specific $12,000 statements, I would reverse the district court's judgment and remand for further proceedings.

_____
**M. MONICA ZAMORA, Judge**

61